**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 11, 2021

_González C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 11, 2021

_Susan L. Carlson_
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint of KURTIS WILLIAM MONSCHKE, Petitioner. | NO. 96772-5 (consolidated with) |
| In the Matter of the Personal Restraint of DWAYNE EARL BARTHOLOMEW, Petitioner. | NO. 96773-3 EN BANC Filed: March 11, 2021 |

GORDON McCLOUD, J.—Dwayne Earl Bartholomew and Kurtis William Monschke were each convicted of aggravated first degree murder and sentenced to life in prison without possibility of parole—a mandatory, nondiscretionary sentence under Washington's aggravated murder statute. RCW 10.95.030. Bartholomew was 20 years old; Monschke was 19. Many years after their convictions, each filed a personal restraint petition (PRP) asking us to consider whether article I, section 14 of our state constitution or the Eighth Amendment to the United States Constitution permits a mandatory life without parole (LWOP)

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

sentence for youthful defendants like themselves. Specifically, they ask us to decide whether the constitutional requirement that judges exercise discretion at sentencing,[1] which forbids such mandatory LWOP sentences for those under 18, also forbids those sentences for 18- to 21-year-old defendants.

Modern social science, our precedent, and a long history of arbitrary line drawing have all shown that no clear line exists between childhood and adulthood. For some purposes, we defer to the legislature's decisions as to who constitutes an "adult." But when it comes to mandatory LWOP sentences, *Miller*'s constitutional guarantee of an individualized sentence—one that considers the mitigating qualities of youth—must apply to defendants at least as old as these defendants were at the time of their crimes. *Miller v. United States*, 567 U.S. 460, 469-80, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Accordingly, we grant both PRPs and order that Bartholomew and Monschke each receive a new sentencing hearing.

### FACTS

Juries convicted both petitioners of aggravated first degree murder, Bartholomew in 1981 and Monschke in 2003.

---

[1] *See Miller v. United States*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012); *State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017).

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

Bartholomew told his brother that he intended to rob a laundromat and "'leave no witnesses.'" *State v. Bartholomew*, 98 Wn.2d 173, 177-78, 654 P.2d 1170 (1982), *vacated*, 463 U.S. 1203, 130 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983), *adhered to on remand*, 101 Wn.2d 631, 683 P.2d 1079 (1984). He took $237 from the cash drawer and fatally shot an attendant in the course of the robbery. *Id.* at 178. He was 20 years old.

A jury initially sentenced Bartholomew to death. *Id.* at 179. But we vacated his death sentence, and then, on remand, a jury sentenced him to LWOP, instead. *Id.* at 216; *Bartholomew*, 101 Wn.2d at 648; *State v. Bartholomew*, 104 Wn.2d 844, 710 P.2d 196 (1985); *see Wood v. Bartholomew*, 516 U.S. 1, 4, 116 S. Ct. 7, 133 L. Ed. 2d 1 (1995).

Monschke and his friends associated themselves with the white supremacist group "Volksfront." *State v. Monschke*, 133 Wn. App. 313, 333, 135 P.3d 966 (2006). In March 2003, the group purchased baseball bats with the goal of helping a member earn "red [shoe]laces"—a symbol "that the wearer had assaulted a member of a minority group." *Id.* at 323 (alteration in original). Separated from Monschke, two members of this group located and savagely beat a homeless man with the bats, rocks, and steel-toed boots. *Id.* They then fetched Monschke, who struck the man 10 to 15 times with a bat while his friends continued to kick the

3

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

man's head. *Id.* at 323-24. Monschke pondered whether "'God gives us little brownie points for this.'" *Id.* at 324. The man died in the hospital after 20 days on life support. *Id.* at 320. Monschke was 19 years old.

Monschke received a mandatory LWOP sentence. *Id.* at 328.

Both sentences were mandatory for these young men. RCW 10.95.030 provides that any person who is convicted of aggravated murder and not sentenced to death[2] "shall be sentenced to life imprisonment without possibility of release or parole."

The petitioners initially filed their PRPs in the Court of Appeals. They claimed that mandatory LWOP is unconstitutionally cruel when applied to youthful defendants like themselves. They argued that developments in neuroscience have rendered a bright line at age 18 arbitrary and that defendants age 21 and younger should receive the benefit of the same constitutional protections that this court and the United States Supreme Court have recognized for juveniles. The Court of Appeals transferred both petitions to this court without ruling on the

---

[2] Since these cases, we have held the death penalty unconstitutional in Washington, *State v. Gregory*, 192 Wn.2d 1, 35, 427 P.3d 621 (2018), converting all death sentences in the state to LWOP and rendering LWOP the only statutorily permissible aggravated murder sentence for persons 18 and older.

4

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*, No. 96772-5 (consol. with 96773-3)

merits, pursuant to RAP 16.5.[3] We consolidated the two petitions and now grant both.

ANALYSIS

I.     BECAUSE THE PETITIONS CLAIM THE AGGRAVATED MURDER STATUTE IS UNCONSTITUTIONAL AS APPLIED, THEY ARE EXEMPT FROM THE ONE-YEAR TIME BAR

Both petitioners' sentences became final long ago, and petitioners are generally barred from filing a PRP "more than one year after the judgment becomes final." RCW 10.73.090(1). But six enumerated exceptions temper this one-year time bar. RCW 10.73.100. One of these exceptions allows petitioners to file a PRP without any deadline if the "statute that the defendant was convicted of violating was unconstitutional on its face or as applied to the defendant's conduct." RCW 10.73.100(2). This exception is important because convictions under unconstitutional statutes "are as no conviction at all and invalidate the prisoner's sentence." *In re Pers. Restraint of Runyan*, 121 Wn.2d 432, 445, 853 P.2d 424 (1993).

---

[3] Order Transferring Pet. to Supreme Court, *In re Pers. Restraint of Monschke*, No. 52286-1-II (Wash. Ct. App. Jan. 22, 2019); Order Transferring Pet. to Supreme Court, *In re Pers. Restraint of Bartholomew*, No. 52354-0-II (Wash. Ct. App. Jan. 22, 2019).

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

Each petitioner challenges the constitutionality of RCW 10.95.030, the aggravated murder statute, as applied to him. They do so for the same reason: the statute required mandatory LWOP, while the Washington State Constitution requires the court to exercise discretion at sentencing due to their age. If they are correct that the aggravated murder statute is unconstitutional as applied, then the time bar presents no obstacle to their petitions.[4] RCW 10.73.100(2).

The dissent would draw a distinction between "convictions" and "sentences" and restrict the unconstitutional statute time bar exception to only unconstitutional "convictions." Dissent at 7-8. But we need not decide today whether RCW 10.73.100(2) provides a time bar exception for other unconstitutional sentencing statutes; in this case, the petitioners challenge not a regular sentencing statute but the aggravated murder statute. The aggravated murder statute is different than other sentencing statutes—it requires the State to charge and the jury (or other trier

---

[4] A PRP petitioner must also show actual and substantial prejudice resulting from the alleged error. *In re Pers. Restraint of Meippen*, 193 Wn.2d 310, 315-16, 440 P.3d 978 (2019) (petitioner unable to show prejudice because record indicated resentencing would be unlikely to reduce petitioner's sentence). But unlike the petitioner in *Meippen*, no judge has ever exercised any discretion in sentencing Monschke or Bartholomew. Under the aggravated murder statute, the trial court was statutorily required to sentence them each to life without parole. If petitioners are entitled to any of the discretionary protections afforded juvenile defendants, then the trial court must receive a chance to exercise that discretion. And the petitioners must receive a new sentencing proceeding that accounts for the mitigating qualities of youth and complies with article I, section 14.

6

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

of fact) to find the defendant "guilty" of that very same aggravated murder charge. In other words, petitioners' challenge to the constitutionality of the aggravated murder statute, which criminalizes premeditated first degree murder as aggravated murder in certain circumstances, *is* a challenge to the criminal statute that they were "convicted of violating." RCW 10.95.030; 10.73.100.[5]

To be sure, petitioners challenge the section of the aggravated murder statute that requires LWOP for all convictions, RCW 10.95.030, and not the section that defines aggravated murder and lists aggravating circumstances, RCW 10.95.020. *See State v. Goldberg*, 149 Wn.2d 888, 894, 72 P.2d 1083 (2003), *overruled on other grounds by State v. Guzman Nuñez*, 174 Wn.2d 707, 713, 285 P.3d 21 (2012) ("RCW 10.95.020 defines the aggravating circumstances that make premeditated murder first degree murder punishable under that chapter rather than under the

---

[5] Petitioners' claim that RCW 10.73.100(2) reaches sentences as well as convictions is also consistent with our precedent. We have rejected a distinction between "sentence[s]" and "conviction[s]" in the PRP time bar context as "absurd." *In re Pers. Restraint of Skylstad*, 160 Wn.2d 944, 952, 162 P.3d 413 (2007). In *Skylstad*, we interpreted RCW 10.73.090(3)(b), which stated that a criminal "'judgment becomes final on . . . [t]he date that an appellate court issues its mandate disposing of a timely direct appeal from the *conviction*.'" *Id.* at 947 (emphasis added) (quoting RCW 10.73.090(3)(b)). The State "focuse[d] solely on one word—conviction—rather than reading the sentence and the statute as a whole." *Id.* at 953. We acknowledged that "conviction, judgment, and sentence certainly are not interchangeable" but held that a "direct appeal from [a] conviction cannot be disposed of until both [the] conviction *and sentence* are affirmed and an appellate court issues a mandate terminating review of both issues." *Id.* at 953-54 (emphasis added).

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

Sentencing Reform Act of 1981, chapter 9.94A RCW."). But they challenge the

constitutionality of the aggravated murder statute nonetheless—the statute they

were each "convicted of violating," in the words of RCW 10.73.100(2).

That statutory exception to the one-year time bar thus clearly applies here.

We therefore need not address the concurrence's point that RCW 10.73.100(6)'s

exception to the time bar applies here, also.

II.     THE AGGRAVATED MURDER STATUTE IS UNCONSTITUTIONAL AS APPLIED TO
        YOUTHFUL DEFENDANTS BECAUSE IT DENIES TRIAL JUDGES DISCRETION TO
        CONSIDER THE MITIGATING QUALITIES OF YOUTH

Article I, section 14 of the Washington Constitution prohibits "cruel

punishment."[6] It does not prohibit mandatory (or discretionary) LWOP sentences

for all aggravated murder defendants. *State v. Hughes*, 106 Wn.2d 176, 202, 721

P.2d 902 (1986); *State v. Grisby*, 97 Wn.2d 493, 497-98, 647 P.2d 6 (1982). But it

---

[6] We have "'repeated[ly] recogni[zed] that the Washington State Constitution's cruel punishment clause often provides greater protection than the Eighth Amendment.'" *State v. Bassett*, 192 Wn.2d 67, 78, 428 P.3d 343 (2018) (alterations in original) (quoting *State v. Roberts*, 142 Wn.2d 471, 506, 14 P.3d 713 (2000)). Specifically, we have identified that "in the context of juvenile sentencing, article I, section 14 provides greater protection than the Eighth Amendment." *Id.* at 82. In this context, where it is "well established" that a state constitutional provision is more protective than the United States Constitution, there is no need to conduct a *Gunwall* analysis each time a new question is presented. *State v. Mayfield*, 192 Wn.2d 871, 878-79, 434 P.3d 58 (2019); *see State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). We "may assume an independent state analysis is justified and move directly to the merits." *Mayfield*, 192 Wn.2d at 879.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

does prohibit LWOP sentences for "juvenile offenders." *State v. Bassett*, 192

Wn.2d 67, 90, 428 P.3d 343 (2018). That state constitutional bar against "cruel

punishment," like the Eighth Amendment bar against "cruel and unusual

punishments," also forbids mandatory LWOP sentences for juvenile offenders.

*Miller*, 567 U.S. at 479. It further requires courts to exercise "complete discretion

to consider mitigating circumstances associated with the youth of any juvenile

defendant," even when faced with mandatory statutory language. *State v.

Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017).

These petitioners argue that the protection against mandatory LWOP for

juveniles should extend to them because they were essentially juveniles in all but

name at the time of their crimes. As the discussion below shows, we agree.

Preliminarily, though, we need to clarify why we take this approach, rather

than the "categorical" approach that the dissent advances. Dissent at 9 (citing

*Bassett*, 192 Wn.2d at 85-86, for the categorical bar test, and *State v. Fain*, 94

Wn.2d 387, 397, 617 P.2d 720 (1980), for the proportionality test).

The categorical bar test that we used in *Bassett* and the proportionality test

that we used in *Fain* were designed for a different purpose. We apply them to

determine when a particular punishment is categorically cruel in violation of article

I, section 14 in the first place. *Bassett*, 192 Wn.2d at 83. But we already know

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

that mandatory LWOP is unconstitutionally cruel as applied to youthful

defendants. *Miller*, 567 U.S. at 479-80. We need not decide whether new

constitutional protections apply in this case because the petitioners do not ask for

new constitutional protections. Rather, they ask us to apply the existing

constitutional protections of *Miller* to an enlarged class of youthful offenders older

than 17.[7] Accordingly, instead of the categorical bar test, we scrutinize whether an

arbitrary distinction between 17- and 18-year-olds for purposes of mandatory

LWOP passes constitutional muster.[8]

---

[7] For a fuller discussion of the need to apply the distinct *Miller* approach that we apply here, see Part III, *infra*.

[8] It is certainly true that under the categorical bar test, we would typically consider "(1) whether there is objective indicia of a national consensus against the sentencing practice at issue and (2) the court's own independent judgment based on '"the standards elaborated by controlling precedents and by the [c]ourt's own understanding and interpretation of the [cruel punishment provision]'s text, history, . . . and purpose."'" *Bassett*, 192 Wn.2d at 83 (alterations in original) (quoting *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 421, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008))). The dissent errs, however, in denying that there is any national trend worthy of note for purposes of that test. There is certainly no national majority of state legislatures or courts prohibiting mandatory LWOP for 18- to 20-year-olds. But there is definitely an affirmative trend among states to carve out rehabilitative space for "young" or "youthful" offenders as old as their mid-20s. *See, e.g.*, COLO. REV. STAT. § 18-1.3-407(2)(a)(III)(B) (defining "'[y]oung adult offender'" to mean "a person who is at least eighteen years of age but under twenty years of age when the crime is committed and under twenty-one years of age at the time of sentencing"); D.C. CODE 24-901(6) (defining "'[y]outh offender'" as "a person 24 years of age or younger at the time that the person committed a crime other than murder" or several other specific crimes); FLA. STAT. ANN. § 958.04 (permitting courts to sentence as "'youthful

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

All parties agree that neuroscience does not provide any such distinction. The petitioners have shown that many youthful defendants older than 18 share the same developing brains and impulsive behavioral attributes as those under 18. Thus, we hold that these 19- and 20-year-old petitioners must qualify for some of the same constitutional protections as well.

---

offenders'" defendants between 18 and 21 of a noncapital or "life" felony); GA. CODE. ANN. § 42-7-2(7) (defining "'[y]outhful offender'" to mean "any male offender who is at least 17 but less than 25 years of age at the time of conviction and who in the opinion of the department has the potential and desire for rehabilitation"); MICH. COMP. LAWS ANN. § 762.11(1) (permitting sentencing courts to designate certain offenders between age 17 and 21 as "youthful trainee[s]," up to age 24 with the consent of the prosecutor); S.C. CODE ANN. § 24-19-10(d)(ii) (defining "'[y]outhful offender'" to include persons "seventeen but less than twenty-five years of age at the time of conviction for an offense that is not a violent crime" and meets other specifications); VT. STAT. ANN. tit. 33 § 5281 (allowing "defendant[s] under 22 years of age" to move to be treated as a "youthful offender"); *see also* CONNIE HAYEK, NAT'L INST. OF JUST., ENVIRONMENTAL SCAN OF DEVELOPMENTALLY APPROPRIATE CRIMINAL JUSTICE RESPONSES TO JUSTICE-INVOLVED YOUNG ADULTS 6 (2016) (analyzing and evaluating over 130 programs for "justice-involved young adult[s]" across the country), https://www.ojp.gov/pdffiles1/nij/249902.pdf [https://perma.cc/DT9N-FRPW]. "One rationale for young offender status is to protect young offenders from the harshness and collateral consequences of criminal prosecution and conviction." Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641, 660 n.123 (2016) (citing *Raines v. State*, 317 So. 2d 559, 561 (Ala. 1975); *People v. Perkins*, 309 N.W.2d 634, 636-37 (Mich. Ct. App. 1981)); *see also* Josh Gupta-Kagan, *The Intersection Between Young Adult Sentencing and Mass Incarceration*, 4 WIS. L. REV. 669, 682-88 (2018) ("Broader trends seek to treat a larger group of young adult offenders as a distinct category.").

11

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

### A. CONSTITUTIONAL PROTECTIONS FOR YOUTHFUL CRIMINAL DEFENDANTS HAVE GROWN MORE PROTECTIVE OVER THE YEARS

We first look to the history of constitutional protections against cruel sentences for juveniles under the Eighth Amendment. While the United States Supreme Court has drawn bright lines between various ages and types of defendants, those bright lines have shifted over time.

At the time of the nation's founding, "the common law set the rebuttable presumption of incapacity to commit any felony at the age of 14, and theoretically permitted capital punishment to be imposed on anyone over the age of 7." *Stanford v. Kentucky*, 492 U.S. 361, 368, 109 S. Ct. 2969, 106 L. Ed. 2d 306 (1989) (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *23-24; MATTHEW HALE, PLEAS OF THE CROWN 24-29 (1800)), *overruled in part by Roper v. Simmons*, 543 U.S. 551, 574-75, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); *State v. J.P.S.*, 135 Wn.2d 34, 37, 954 P.2d 894 (1998) (recognizing the same original common law ages and that "Washington codified these presumptions, changing the age of incapacity to 7 and younger and the age of presumed capacity to 12 and older").

The United States' "age of majority" was largely set at 21, until it changed to 18 "for reasons quite unrelated to capacity." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 TULANE L. REV. 55, 57 (2016). Twenty-one had been the

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

"near universal" age of majority in the United States from its founding until 1942

when "wartime needs prompted Congress to lower the age of conscription from

twenty-one to eighteen, a change that would eventually lead to the lowering of the

age of majority generally." *Id.* at 64; Pub. L. No. 77-772, 56 Stat. 108, 1019

(1942) (changing selective service registration age to 18). The linking of military

obligation and political participation led to the Twenty-Sixth Amendment; in 1971,

it lowered the voting age to 18. *Id.* at 64-65; U.S. CONST. XXVI. States across the

country—including Washington—quickly followed suit, lowering the "age of

majority" to 18 for many purposes.[9] RCW 26.28.010; LAWS OF 1971, 1st Ex.

Sess., ch. 292, § 1.

The age at which the Eighth Amendment prohibits imposition of capital

punishment on a youthful defendant has also changed with time. In two plurality

opinions in the late 1980s, the United States Supreme Court held that capital

punishment was unconstitutional for a 15-year-old offender, but permissible for

16- or 17-year-old offenders. *Thompson v. Oklahoma*, 487 U.S. 815, 108 S. Ct.

---

[9] Several states continue to recognize an age of majority older than 18. *See, e.g.*, MISS. CODE ANN. § 1-3-27 (defining minor as "any person, male or female, under twenty-one years of age"); ALA. CODE § 26-1-1 (setting age of majority at 19); NEB. REV. STAT. § 43-245 ("Age of majority means nineteen years of age."). As we discuss in further detail below, the statutory "age of majority" is riddled with exceptions.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

2687, 101 L. Ed. 2d 702 (1988); *Stanford*, 492 U.S. 361. Justice O'Connor, the determinative fifth vote in each case, based the difference on her understanding that "no national consensus forbids the imposition of capital punishment on 16- or 17-year-old capital murderers" as distinct from 15-year-olds. *Stanford*, 492 U.S. at 381 (O'Connor, J., concurring in part and concurring in the judgment). She recognized that "[t]he day may come when there is such a general legislative rejection of the execution of 16- or 17-year-old capital murderers that a clear national consensus can be said to have developed," but she did not believe that day had arrived in 1989. *Id.* at 381-82.

Sixteen years later, it had. In *Roper*, the Court held that executing a defendant under 18 was categorically unconstitutional. The court based this change on "[t]hree general differences between juveniles under 18 and adults." *Roper*, 543 U.S. at 569. First, "'[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young,'" resulting in "'impetuous and ill-considered actions and decisions.'" *Id.* (alteration in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993)). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102

14

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

S. Ct. 869, 71 L. Ed. 2d 1 (1982)).  And third, "the character of a juvenile is not as well formed as that of an adult."  *Id.* at 570.  *Roper* recognized that the "qualities that distinguish juveniles from adults do not disappear when an individual turns 18" but held that "a line must be drawn."  *Id.* at 574.  Because "[t]he logic of *Thompson* extends to those who are under 18" and because "18 is the point where society draws the line for many purposes between childhood and adulthood," the Court made it "the age at which the line for death eligibility ought to rest."  *Id.* at 574-75 (citing *Thompson*, 487 U.S. at 833-38).

As Eighth Amendment jurisprudence forbidding the execution of adolescent offenders developed, the law regarding intellectually disabled defendants followed a parallel track.[10]  The United States Supreme Court had allowed execution of the intellectually disabled in 1989, *Penry v. Lynaugh*, 492 U.S. 302, 340, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (plurality portion), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 321, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  As in *Stanford*, the

---

[10] For many years the Supreme Court spoke of the intellectually disabled as "mentally retarded."  *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).  It has since recognized and approved a change in terminology to "intellectually disabled" to "describe the identical phenomenon."  *Hall v. Florida*, 572 U.S. 701, 704, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014).  We use the term "intellectually disabled" throughout this opinion.

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

majority recognized that "a national consensus against execution of the mentally retarded may someday emerge reflecting the 'evolving standards of decency that mark the progress of a maturing society'" but did not believe such a consensus existed in 1989. *Id.*

That consensus had arrived by 2002. As *Roper* signaled a change from *Stanford*, so *Atkins* signaled a change from *Penry*. 536 U.S. at 321 (holding that execution of the intellectually disabled violates the Eighth Amendment). Indeed, *Roper* relied in part on *Atkins* as an example of "society's evolving standards of decency." 543 U.S. at 563. *Atkins* provided an example of changing standards, even though the "rate of change in reducing the incidence of the juvenile death penalty" had been much slower than the pace at which states abolished capital punishment for the intellectually disabled. *Id.* at 565.

The changes from *Stanford* and *Penry* to *Atkins* and *Roper* resulted from a perceived change in direction across the country. Recognizing the shift, the Court observed that "[i]t is not so much the number of these States [that forbade execution of the intellectually disabled] that is significant, but the consistency of

16

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

the direction of change."[11]  *Atkins*, 536 U.S. at 315; *see Bassett*, 192 Wn.2d at 86

(quoting *Atkins* for this same proposition).

Clearly, bright constitutional lines in the cruel punishment context shift over

time in order to accord with the "evolving standards of decency that mark the

progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 100-01, 78 S. Ct.

590, 2 L. Ed. 2d 630 (1958) (plurality opinion).

### B. THE COURT WILL NOT NECESSARILY DEFER TO LEGISLATIVE BRIGHT-LINE DRAWING WHEN DETERMINING WHAT CONSTITUTES CRUEL PUNISHMENT

*Roper* set a bright constitutional line based on "where society draws the line

for many purposes between childhood and adulthood."  543 U.S. at 574.  But some

bright statutory lines fail to comply with the Eighth Amendment.

In *Hall v. Florida*, 572 U.S. 701, 134 S. Ct. 1986, 188 L. Ed. 2d 1007

(2014), for example, a Florida court sentenced a defendant to death, despite his

unchallenged evidence of an intellectual disability.  The record contained ample

---

[11] To be sure, the shift that led to *Roper* and *Atkins* concerned the cruelty of capital punishment.  But since those cases, the United States Supreme Court and our court have recognized the similarities between capital punishment and LWOP.  *Graham*, 560 U.S. at 69-70 (an LWOP sentence "'means the denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days'" (alteration in original) (quoting *Naovarath v. State*, 105 Nev. 525, 526, 779 P.2d 944 (1989))); *Bassett*, 192 Wn.2d 87-88 (same).  And under the Washington Constitution, LWOP sentences for juveniles are impermissibly cruel.  *Bassett*, 192 Wn.2d at 91.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

evidence of this intellectual disability. *Id.* But a Florida statute required that "as a threshold matter, Hall show an IQ [intelligence quotient] test score of 70 or below before presenting any additional evidence of his intellectual disability." *Id.* at 707.

In evaluating the constitutionality of this rigid bright line of an IQ of 70, the Court first reiterated that the intellectually disabled "may not . . . receive the law's most severe sentence." *Id.* at 709 (citing *Atkins*, 436 U.S. at 318). The Court then stated the issue presented: "how intellectual disability must be defined in order to implement the[] principles and the holding of *Atkins*." *Id.* at 709-10. To analyze the cutoff rule, the Court considered "psychiatric and professional studies that elaborate on the purpose and meaning of IQ scores to determine how the scores relate to the holding of *Atkins*"—it was "proper to consult the medical community's opinions." *Id.* Though "[i]t is the Court's duty to interpret the Constitution . . . it need not do so in isolation." *Id.* at 721. "The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." *Id.*

Considering three criteria by which the medical community defines intellectual disability,[12] "Florida's rule disregard[ed] established medical practice

---

[12] These criteria were "significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*, No. 96772-5 (consol. with 96773-3)

in two interrelated ways. It [took] an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence" and it "relie[d] on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Id.* at 712. By failing to account for other factors, "and setting a strict cutoff at 70, Florida '[went] against the unanimous professional consensus.'" *Id.* at 722. "An IQ score is an approximation, not a final and infallible assessment of intellectual functioning." *Id.*

Though IQ was "of considerable significance," state use of IQ scores to determine death eligibility "must afford these test scores the same studied skepticism that those who design and use these tests do, and understand that an IQ test score represents a range rather than a fixed number." *Id.* at 723. It was unconstitutional "to execute a man because he scored 71 instead of 70 on an IQ test." *Id.* at 724.

Like the Florida statute at issue in *Hall*, our aggravated murder statute sets a flat cutoff line in determining a defendant's sentence: age 18. RCW 10.95.030(3)(a)(ii). Yet many other statutes draw lines at many other ages

---

circumstances), and onset of these deficits during the developmental period." *Hall*, 572 U.S. at 710 (citing *Atkins*, 536 U.S. at 308 n.3).

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

between 8 and 26. We next turn to these statutes to get a sense of how our

legislature has defined the "age of majority."

### C. THE CONCEPT OF AN "AGE OF MAJORITY" IS INHERENTLY AND NECESSARILY FLEXIBLE

*Roper* set 18 as a constitutional bright line for death eligibility because it "is

the point where society draws the line for many purposes between childhood and

adulthood." 543 U.S. at 574. Washington calls that general line the "age of

majority": "[e]xcept as otherwise specifically provided by law, all persons shall be

deemed and taken to be of full age for all purposes at the age of eighteen years."

RCW 26.28.010.[13] But as it turns out, areas "otherwise specifically provided by

law" abound.

The Washington Criminal Code itself draws lines between many distinct

ages besides 17 and 18. It renders children under 8 incapable of committing crime.

RCW 9A.04.050. And children between 8 and 12 are presumed incapable of

committing crime. *Id.* The Juvenile Justice Act of 1977 defines "juvenile,"

---

[13] Some specific enumerated "purposes" for which age 18 is relevant include allowing 18-year-olds to "enter into any marriage contract without parental consent," "execute a will," "vote in any election if authorized by the Constitution," and "enter into any legal contractual obligation and to be legally bound thereby." RCW 26.28.015(1)-(4). Many of these purposes also include the tautological qualification "if otherwise qualified by law." RCW 26.28.015(1)-(3).

20

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

"youth," and "child" all synonymously to mean "any individual who is under the

chronological age of eighteen years and who has not been previously transferred to

adult court." RCW 13.40.020(15). But individuals transferrable to such adult

court may be as young as 15 if charged with a serious violent offense—or any age

if charged with murder or custodial assault while already under sentence.[14] RCW

13.40.110(1)(a), (b). When a child remains in juvenile court, that juvenile court

may, in some scenarios, maintain "residual" jurisdiction until the child reaches age

25. RCW 13.04.030(1)(e)(v)(C)(II).

Other criminal statutes draw the line between "childhood" and "adulthood"

at other ages. *See, e.g.*, RCW 9A.44.079(1) (setting oldest possible age of a victim

of the crime, "Rape of a child," at 15); RCW 66.44.290(4) (making it a

misdemeanor for persons under 21 to purchase liquor). Plenty of examples outside

the criminal law context exist as well. *See, e.g.*, RCW 46.20.031(1) (setting

minimum age to receive a driver's license at 16), .265(2) (suspending juvenile

driving privileges until various ages between 17 and 21); RCW 70.24.110

(allowing those 14 or older to obtain medical care for sexually transmitted diseases

---

[14] Until 2018, transfer to adult court was mandatory for 16- and 17-year-olds who committed class A felonies, as well as 17-year-olds who committed various other crimes. LAWS OF 2018, ch. 162, § 4.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

without parental consent); RCW 74.13.031(12) (providing government authority

for "adoption support benefits, or relative guardianship subsidies on behalf of

youth ages eighteen to twenty-one years" who meet certain conditions), (16)

(providing government authority to "provide independent living services to youths,

including individuals who have attained eighteen years of age, and have not

attained twenty-three years of age"); *see also* 42 U.S.C. § 18014(d)(2)(E)

(providing Affordable Care Act medical coverage to "adult children" through age

26).

These numerous meanings of "child" and "adult" located throughout the

code do not reflect inconsistency. They reflect the need for flexibility in defining

the nebulous concept of "adulthood" or "majority." Accordingly, dividing lines are

set at different ages in different contexts. Among these many ages of "majority"

that Washington chooses for various contexts, the age at which our legislature has

required mandatory LWOP for defendants convicted of aggravated murder sits at

18.[15]  RCW 10.95.030(3).

---

[15] It was initially the United States Supreme Court, and not the Washington Legislature, who set this line at 18. Until *Miller*, RCW 10.95.030 required LWOP for all defendants without taking age into account at all. LAWS OF 2014, ch. 130, § 9. That statute was updated in 2014 with what has been referred to as the "*Miller*-fix": it brought Washington statutory law into compliance with the constitutional principles of *Miller*. *See, e.g.*, *Bassett*, 192 Wn.2d at 77.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

### D. No Meaningful Developmental Difference Exists Between the Brain of a 17-Year-Old and the Brain of an 18-Year-Old

*Roper* considered juveniles' lack of maturity and responsibility, their vulnerability to negative influences, and their transitory and developing character when it increased the minimum age for death eligibility from 16 to 18. 543 U.S. at 569-70. All three of these factors weigh in favor of offering similar constitutional protections to older offenders, also, because neurological science recognizes no meaningful distinction between 17- and 18-year-olds as a class.

We have already concluded that under the Sentencing Reform Act of 1981, ch. 9.94A RCW, "age may well mitigate a defendant's culpability, even if that defendant is over the age of 18." *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015). The fact that the legislature "did not have the benefit of psychological and neurological studies showing that the "'parts of the brain involved in behavior control'" continue to develop well into a person's 20s" was one of the factors that compelled that conclusion. *Id.* at 691-92 (footnote omitted) (quoting *Miller*, 567 U.S. at 472 (quoting *Graham v. Florida*, 560 U.S. 48, 68, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010))). The same scientific developments compel us to come to a similar conclusion under article I, section 14.

23

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

*O'Dell* cited articles discussing neurological science extensively. 183 Wn.2d at 692 n.5 (citing Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 89, 152 & n.252 (2009); *MIT Young Adult Development Project: Brain Changes*, MASS. INST. OF TECH., http://hr.mit.edu/static/worklife/youngadult/brain.html (last visited Mar. 8, 2021); Jay N. Giedd, *Structural Magnetic Resonance Imaging of the Adolescent Brain*, 1021 ANN. N.Y. ACAD. SCI. 77 (2004)). The parties bring additional, more recent studies, to our attention. *See, e.g.*, Pet'r's Suppl. Br. (Bartholomew) at 9-10 (citing, e.g., Kathryn Monahan et al., *Juvenile Justice Policy and Practice: A Developmental Perspective*, 44 CRIME & JUST. 577, 582 (2015); Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 TEMPLE L. REV. 769 (2016); Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016)). The overarching conclusion compelled by these sources is clear: "biological and psychological development continues into the early twenties, well beyond the age of majority." Scott, *supra*, at 642.

The State does not dispute this conclusion. Rather, it contends that *Miller* is not about "brain science" at all and it cites experts who resist the use of neuroscience in legal decision-making altogether. Suppl. Br. of Resp't at 12-13.

24

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

While all three articles cited by the State emphasize the difficulty of analyzing *individual* adolescent brains, they support the petitioners' position that there is no distinctive scientific difference, in general, between the brains of a 17-year-old and an 18-year-old. Richard J. Bonnie & Elizabeth S. Scott, *The Teenage Brain: Adolescent Brain Research & the Law*, 22 CURRENT DIRECTIONS IN PSYCHOL. SCI. 158, 161 (2013) ("So far, neuroscience research provides group data showing a developmental trajectory in brain structure and function during adolescence and into adulthood."); Maroney, *supra*, at 94 ("Rather than raising deep and likely unsolvable questions about human agency, [neuroscience] simply reinforces the (once) non-controversial idea that, as a group, young people differ from adults in systematic ways directly relevant to their relative culpability, deterability, and potential for rehabilitation."); B.J. Casey & Kristina Caudle, *The Teenage Brain: Self Control*, 22 CURRENT DIRECTIONS IN PSYCHOL. SCI. 82 (2013) (discussing overgeneralizations of adolescent brains but never mentioning what age is meant by "adolescence"). Maroney criticizes the way courts have used neuroscience to justify their conclusions and argues that "the impact of adolescent brain science on juvenile justice has been strongly cabined by the extrinsic reality of legal doctrine." Maroney, *supra*, at 144-45.

25

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The State's conclusion from these articles appears to be that because there is no accounting for the brain development and maturity of particular individuals, we may as well give up and let the legislature draw its arbitrary lines—because they will necessarily be arbitrary no matter where they are drawn. But giving up would abdicate our responsibility to interpret the constitution. The State is correct that every individual is different, and perhaps not every 20-year-old offender will deserve leniency on account of youthfulness. But the variability in individual attributes of youthfulness are exactly why courts must have discretion to consider those attributes as they apply to each individual youthful offender. That is why mandatory sentences for youthful defendants are unconstitutional. *Miller*, 567 U.S. at 477-80 (requiring consideration of the specific youthful characteristics of each individual defendant); *Houston-Sconiers*, 188 Wn.2d at 23 (requiring consideration at sentencing of defendant's individual youthful characteristics and many other individual factors related to culpability).

In fact, this court has already invalidated age 18 as an arbitrary bright line in the context of capacity to consent to abortion. In *State v. Koome*, 84 Wn.2d 901, 530 P.2d 260 (1975) (plurality opinion), we evaluated the constitutionality of a statute that required pregnant women under 18 to get parental consent to obtain an abortion. We held that such an abridgment of the young woman's right to make

26

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

this decision about her reproductive health was unconstitutional. *Id.* at 909-10.[16]

We noted that "[p]arental authority wanes gradually as a child matures; it does not

suddenly disappear at adulthood. Similarly, the ability to competently make an

important decision, such as that to have an abortion, develops slowly and at

different rates in different individuals." *Id.* at 910-11. While we acknowledged

that the State may "create age limits which do not perfectly correspond with the

capacity of minors to act as adults," we held that "a subjective inquiry into the

maturity of each individual minor is a practical impossibility, and any flat age limit

is necessarily arbitrary." *Id.* at 911. "In such circumstances imprecision in age

classifications may be permissible, perhaps even where important rights are

affected, because it is inevitable." *Id.* But, in the abortion context, "these reasons

for setting arbitrary age requirements [were] not present" because "[t]he age of

fertility provides a practical minimum age requirement for consent to abortion,

reducing the need for a legal one." *Id.* (citing *Ballard v. Anderson*, 4 Cal. 3d 873,

883, 484 P.2d 1345, 95 Cal. Rptr. 1 (1971)).

---

[16] The lead opinion received four votes. *Koome*, 84 Wn.2d at 914. The concurrence, which provided the fifth vote, agreed that it would "reach the same result as the [lead] opinion regarding the constitutional infirmities of the present statute." *Id.* (Finley, J. concurring). It added that while the State could conceivably draft an abortion restriction consistent with the constitution, the age-related parental consent requirement considered by the court was unconstitutional. *Id.* at 915-17.

27

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

Science may assist our understanding of not just sexual development but also neurological development. Neuroscientists now know that all three of the "general differences between juveniles under 18 and adults" recognized by *Roper* are present in people older than 18. 543 U.S. at 569. While not yet widely recognized by legislatures, we deem these objective scientific differences between 18- to 20-year-olds (covering the ages of the two petitioners in this case) on the one hand, and persons with fully developed brains on the other hand, to be constitutionally significant under article I, section 14.

E.  *OUR CONSTITUTION'S PROTECTION AGAINST LIFE WITHOUT PAROLE SENTENCES EXTENDS TO YOUTHFUL DEFENDANTS OLDER THAN 18*

Much like the Florida IQ cutoff in *Hall*, RCW 10.95.030 disregards many scientific indicia of youthfulness in favor of a single, relatively inconsequential number: a defendant's age. Just as "an individual's intellectual functioning cannot be reduced to a single numerical score," neither can an individual's level of maturity. *Hall*, 572 U.S. at 713. Though we sometimes allow legislative "age limits which do not perfectly correspond with the capacity of minors to act as adults," we will not hesitate to strike them down where they violate the constitution, especially where better, more scientific age limits are available. *Koome*, 84 Wn.2d at 911. We hold that the aggravated murder statute's rigid

28

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

cutoff at age 18 combined with its mandatory language creates an unacceptable risk that youthful defendants without fully developed brains will receive a cruel LWOP sentence.

But we also recognize that every individual is different. *See, e.g.*, Bonnie & Scott, *supra*, at 161 ("[T]he research does not currently allow us to move from that group data to measuring the neurobiological maturity of an individual adolescent because there is too much variability within age groups and across development. Indeed, we do not currently have accurate behavioral measures of maturity." (citation omitted)). Though a categorical constitutional rule may be appropriate prohibiting LWOP sentences for offenders younger than 18, *Bassett*, 192 Wn.2d at 90, the petitioners have neither argued nor shown that LWOP would be *categorically* unconstitutional as applied to older defendants.

What they have shown is that no meaningful neurological bright line exists between age 17 and age 18 or, as relevant here, between age 17 on the one hand, and ages 19 and 20 on the other hand. Thus, sentencing courts must have discretion to take the mitigating qualities of youth—those qualities emphasized in *Miller* and *Houston-Sconiers*—into account for defendants younger and older than 18. Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will. We leave it up to sentencing courts to determine

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

which individual defendants merit leniency for these characteristics.  Our

aggravated murder statute's requirement of LWOP for *all* defendants 18 and older,

regardless of individual characteristics, violates the state constitution.[17]

Because the aggravated murder statute that petitioners were convicted of

violating is unconstitutional as applied to their conduct, the one-year time bar for

collateral attacks does not apply.  RCW 10.73.100(2).[18]

III.     WE DO NOT ABANDON THE CATEGORICAL BAR ANALYSIS; OUR DECISION
         "FLOWS STRAIGHTFORWARDLY FROM OUR PRECEDENTS" AS DID THE
         DECISION IN *MILLER*

The dissent accuses us of manufacturing a "false distinction to sidestep

*Bassett*" by applying *Miller* to a new class of defendants without invoking *Fain*'s

proportionality test or *Bassett*'s categorical bar test.  Dissent at 10-11.  But this

_____

[17] Contrary to the dissent's accusation, we do not overrule *Grisby*.  *Grisby* held that a "particularized consideration" of individual circumstances is not required for an LWOP sentence for most criminal defendants.  *Id.* at 497.  But youthful defendants have been an exception to this general rule for many years.  *See, e.g.*, *Miller*, 567 U.S. 460; *Houston-Sconiers*, 188 Wn.2d 1.  Today's ruling only expands the class of defendants who qualify for that existing exception.

[18] Petitioners suggest that they also meet the time bar exceptions for sentence in excess of jurisdiction and retroactive change in the law under RCW 10.73.100(5) and (6). Am. PRP (Monschke) at 24-25; Pet'r's Suppl. Br. (Bartholomew) at 18-19; *see* concurrence.  Because we hold the unconstitutional statute exception applies, we need not rule on these other exceptions to the statutory time bar.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

distinction (between cases subject to the categorical bar analysis and cases subject

to a different analysis) is not new.

Contrary to the dissent's characterization, dissent at 10, *Miller* itself

expressly declined to apply a categorical bar analysis. It did not "categorically bar

a penalty for a class of offenders or type of crime—as, for example, [the Supreme

Court] did in *Roper* or *Graham*." 567 U.S. at 483. Instead, *Miller* "mandate[d]

only that a sentencer follow a certain process—considering an offender's youth

and attendant characteristics—before imposing a particular penalty." *Id.* This

made *Miller* "different from the typical [case] in which we have tallied legislative

enactments"—in other words, different from *Bassett* and other categorical rule

cases.[19] *Id.*

In fact, *Miller* explicitly clarified that it "flow[ed] straightforwardly" from

"the principle of *Roper*, *Graham*, and our *individualized sentencing* cases that

_____

[19] The dissent characterizes *Bassett* as "'enlarg[ing]'" the *Miller* class to include "'permanent[ly] incorrigibl[e]'" youths. Dissent at 11 (quoting *Bassett*, 192 Wn.2d at 72, 88-89). But *Miller* and *Bassett* are not equivalent rulings about different classes—they differ in kind. *Bassett* categorically prohibited LWOP for defendants 18 and younger. 192 Wn.2d at 91. *Miller* disavowed categorical rules, instead, mandating only "a certain process" be followed "before imposing a particular penalty." 567 U.S. at 483. In this regard, our decision today is like *Miller* and not like *Bassett*. We do not categorically prohibit LWOP for 18- to 20-year-olds, but we require that courts must exercise some discretion in sentencing them.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

youth matters for purposes of meting out the law's most serious punishments." *Id.*
(emphasis added). It did not flow from a tallying of legislative enactments across
the country; it did "not scrutinize[] or rel[y] in the same way on legislative
enactments." *Id.* (citing *Sumner v. Shuman*, 483 U.S. 66, 107 S. Ct. 2716, 97 L.
Ed. 2d 56 (1987); *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973
(1978); *Eddings*, 455 U.S. 104).

As the discussion above shows, neither do we.

Instead our decision today, like the *Miller* decision, draws from the line of
cases that *Miller* cited for its "individualized sentencing" principle. Those
decisions all relied on the rule, first announced in *Woodson v. North Carolina*, 428
U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion), that
"consideration of the character and record of the individual offender and the
circumstances of the particular offense" are "a constitutionally indispensable part
of the process of inflicting the penalty of death." And those decisions all applied
that rule to invalidate a state death penalty sentencing scheme, irrespective of any
national consensus for or against the specific statute or sentencing practice.
*Sumner*, 483 U.S. at 83-85 (striking down a Nevada statute requiring the death
penalty for defendants convicted of murder while serving a life sentence without
possibility of parole); *Lockett*, 438 U.S. at 608 (striking down an Ohio statute that

32

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl)*,
No. 96772-5 (consol. with 96773-3)

limited mitigating circumstances a trial court could consider before imposing

death); *Eddings*, 455 U.S. at 113 (requiring sentencing courts to consider

mitigating evidence, even where that mitigating evidence did not support a legal

excuse from criminal liability). *Miller* then applied that principle of

"individualized sentencing," developed in the death penalty context, to the juvenile

LWOP context. 567 U.S. at 483 (citing *Sumner*, 483 U.S. at 66; *Lockett*, 438 U.S.

at 602-08; *Eddings*, 455 U.S. at 110-17).

As the discussion above also shows, so do we.[20] In fact, we repeat the

*Miller* approach today. Our decision that individual youthful characteristics may

mitigate the sentences of these two young petitioners "flows straightforwardly

from our precedents." *Id.* No *Fain* or categorical bar analysis is necessary to reach

this decision.

---

[20] Our decision in *Houston-Sconiers* took that same *Miller* approach of valuing "individualized sentencing" and applying it to juveniles who were not sentenced to LWOP. 188 Wn.2d at 20. Although the Supreme Court had "not applied the rule that children are different and require individualized sentencing consideration of mitigating factors" in the exact situation before the court, we applied the *Miller* principle—the "requirement to treat children differently, with discretion, and with consideration of mitigating factors"—to that non-LWOP situation. *Id.* We did not analyze statutes from other states, nor did we turn to *Fain*'s proportionality test. Our decision flowed naturally from *Miller* and applied its principles in a new context.

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

There is no meaningful cognitive difference between 17-year-olds and many 18-year-olds. When it comes to *Miller*'s prohibition on mandatory LWOP sentences, there is no constitutional difference either. Just as courts must exercise discretion before sentencing a 17-year-old to die in prison, so must they exercise the same discretion when sentencing an 18-, 19-, or 20-year-old. We grant Monschke's and Bartholomew's PRPs and vacate their mandatory LWOP sentences. We remand each case for a new sentencing hearing at which the trial court must consider whether each defendant was subject to the mitigating qualities of youth.

*In re PRP of Monschke (Kurtis William)/In re PRP of Bartholomew (Dwayne Earl),*
No. 96772-5 (consol. with 96773-3)

_____
Gordon McCloud, J.

WE CONCUR:

_____        _____


_____        _____
                                                          Yu, J.

_____        _____
                                                   Montoya-Lewis, J.

_____        _____
                                                     Whitener, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*In re Pers. Restraint of Monschke and Bartholomew*, No. 96772-5 (González, C.J., concurring)

No. 96772-5 (consolidated with No. 96773-3)

GONZÁLEZ, C.J. (concurring)— I concur with the lead opinion that the petitioners are entitled to a new sentencing hearing to determine whether their ages at the time of their crimes is a mitigating factor justifying a downward departure from the standard sentence. I part company, however, with its analysis of the retroactivity of *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015). As the dissent properly notes, RCW 10.73.100(2) applies to violations of substantive criminal statutes that have been found unconstitutional, not sentencing statutes. However, I continue to believe that *O'Dell* is a significant change in the law that applies retroactively when material. *In re Pers. Restraint of Light-Roth,* 191 Wn.2d 328, 338-39, 422 P.3d 444 (2018) (González, J., concurring) (citing RCW 10.73.100(6)). Accordingly, I concur.

González, C.J.

1

*In re Pers. Restraint of Monschke and Bartholomew*

No. 96772-5 (consolidated with No. 96773-3)

OWENS, J. (dissenting) — Kurtis Monschke and Dwayne Bartholomew committed brutal murders decades ago. At the time, they were 19 and 20 years old, respectively. They were not children. Under Washington law, when an individual turns 18 years old, they are empowered to make a range of life-altering decisions: suddenly, they can form contracts, drop out of school, get married, work a hazardous job, and serve in the military. But at this same moment, they also obtain the full responsibilities and consequences of adulthood, and the court will no longer intervene on their behalf on the basis of age. Nonetheless, the lead opinion holds today that we must create an exception in treating these individuals as adults when they commit aggravated murder between the ages of 18 and 20. Mandatory life without parole (LWOP) sentences are now prohibited for this age category. The lead opinion crafts this new rule by filtering our state constitution's "cruel punishment" prohibition through a handful of scientific studies and circumvents the reality that no legislatures or courts in the other 49 states have ever recognized such a protection. WASH.

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONST. art. I, § 14.  As the final arbiters of what "cruel" means under article I, section 14 of our state constitution, this court must use a disciplined and evenhanded approach in evaluating its meaning.  If we do not, we risk transforming our protection against "cruelty" into whatever is supported by a smattering of studies and five concurring members of this court.

At the heart of this case is the important question of when a person should be held fully accountable as an adult.  This is a question that requires a meticulous examination of a number of scientific, moral, ethical, and practical considerations.  Our court is not a legislature, and it is insufficiently equipped to decide this issue on selectively presented evidence put forth by limited parties on a constrained schedule.  The lead opinion broadly seeks to protect against the "unacceptable risk that youthful defendants without fully developed brains will receive a cruel LWOP sentence."  Lead opinion at 29.  But I struggle to identify at what precise age we will stop redrawing these lines based on this brain development evidence, be it 20, 22, 25, or even older.  I further caution that today's decision may eventually compel us to revisit and invalidate a staggering number of LWOP and Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, sentences for this growing group under our recent decisions

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in *State v. Bassett*[1] and *State v. Houston-Sconiers*.[2] This task would tremendously

burden the State's resources and the victims' families. I respectfully dissent.

## ANALYSIS

I.     *The Legislature's Determination of the Age of Majority Encapsulates More Considerations Than When a Youth's Brain Is Fully Developed*

The lead opinion today announces a broad new constitutional safeguard

protecting "youthful defendants [ages 18 to 20] without fully developed brains." Lead

opinion at 29. In doing so, the lead opinion extends a protection to convicted

murderers that may shield these individuals from the full legal consequences of their

actions. I note that once an individual turns 18 years old in Washington, he or she can

form contracts, drop out of school, enter into marriage, vote in an election, obtain a

driver's license, work a hazardous job, and enlist in the military. Upon turning 18,

individuals receive all of these rights of adulthood, regardless of whether their brains

are fully developed. At 18, the court will no longer interfere with the exercise of these

rights on the basis of age. Additionally, these rights are accompanied by the

responsibilities and consequences of adulthood.

---

[1] 192 Wn.2d 67, 428 P.3d 343 (2018) (holding that all LWOP sentences for juveniles are unconstitutionally cruel under the Washington Constitution).

[2] 188 Wn.2d 1, 391 P.3d 409 (2017) (holding that courts have full discretion to depart from juvenile SRA sentences based on "youthfulness").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Children are different, certainly. But Monschke and Bartholomew were not children when they brutally murdered their victims. When a child becomes an adult is a question that necessarily involves significant input from a variety of disciplines. The lead opinion today casts aside this long-standing deference to the legislature because it believes that the current line at 18 is "arbitrary." Lead opinion at 24-25. The lead opinion contends the line at 18 is arbitrary because there is "no distinctive scientific difference, in general, between the brains of a 17-year-old and an 18-year-old"; and it notes that at 18, these youths' brains are not fully developed, which leads to decision-making based on immaturity and impulsivity. Lead opinion at 25. But the lead opinion assumes that the legislature did not already know or account for this when it enacted the age of majority. For example, the legislature may have set the age of majority based on when an individual has *sufficient* brain development, experience, and legal autonomy to make important life decisions, like deciding to commit a crime. Today's reasoning ignores the possibility that the age of majority is based less on scientific exactitude, and more on "society's judgments about maturity and responsibility." *Davis v. Dep't of Licensing*, 137 Wn.2d 957, 974, 977 P.2d 554 (1999).

In prohibiting mandatory LWOP, the lead opinion now requires courts to exercise discretion in imposing LWOP sentences upon 18-20 year olds, as it asserts that we must provide individualized sentencing for defendants "at least as old as [20]."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Lead opinion at 2, 29-30 (citing *Miller v. Alabama*, 567 U.S. 460, 469-80, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)).

I first note that nowhere does *Miller* require that we draw a line at 20. Lead opinion at 2. Further, the lead opinion's requirement of "individualized sentenc[ing]," conflicts with our precedent, *State v. Grisby*, 97 Wn.2d 493, 497, 647 P.2d 6 (1982), which held that adults are not entitled to such a "'particularized consideration'" under our state constitution's cruel punishment prohibition. Lead opinion at 2, 30 n.17 (quoting *Grisby*, 97 Wn.2d at 497). Thus, the court today overrules precedent that dictates that adults are not entitled to individualized sentencing, despite the fact that petitioners failed to make the requisite showing that *Grisby* is incorrect or harmful. *State v. Barber,* 170 Wn.2d 854, 863, 248 P.3d 494 (2011).

I further note the surprising optimism about the courts' ability to exercise discretion in imposing an LWOP sentence now that mandatory LWOP is prohibited. This requires distinguishing young defendants whose crimes reflect "transient immaturity" from those whose crimes reflect "irreparable corruption." *Miller*, 567 U.S. at 479-80. This optimism is negated by our recent holding in *Bassett* where we invalidated all LWOP sentences for juveniles, reasoning that courts are incapable of accurately making this determination. *Bassett*, 192 Wn.2d at 89 (quoting *Roper v. Simmons*, 543 U.S. 551, 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). Given the difficulty even "expert psychologists" have in making this determination, I do not foresee the courts adequately exercising discretion this time around. *Id*.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

I additionally highlight our recent rulings in *Bassett*, 192 Wn.2d 67, and

*Houston-Sconiers*, 188 Wn.2d 1, and their potential implications in light of the court's

holding today. These cases respectively invalidated all LWOP sentences and

effectively eliminated the SRA's mandatory sentencing requirements for juveniles

based on *Miller*, 567 U.S. 460 (holding mandatory LWOP for juveniles is cruel). As

today's holding almost identically mirrors *Miller*, I believe the lead opinion today

paves a path for the court to invoke the same logic underlying *Houston-Sconiers* and

*Bassett* to revisit and invalidate a staggering number of LWOP and SRA sentences,

particularly in light of the retroactive nature of *Houston-Sconiers* established in *In re*

*Personal Restraint of Ali*, 196 Wn.2d 220, 226, 242, 474 P.3d 507 (2020).

As the consequences of today's decision are potentially severe, I would

exercise restraint in interpreting our state constitution. I believe that the people of

Washington and their representatives are fully capable of enacting laws that reflect the

"'evolving standards of decency that mark the progress of a maturing society.'"

*Miller*, 567 U.S. at 494 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285,

50 L. Ed. 2d 251 (1976)). And if the legislature is not up to this task, we nonetheless

have sufficient constitutional doctrine to guide us in addressing these matters, as I

later address.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

II.     *The Limitations of Personal Restraint Petitions Are Eroded by Invoking The "Constitutionality" Exception to the Time Bar under RCW 10.73.100(2)*

Under Washington law, Bartholomew and Monschke as convicted murderers do not have unlimited attempts to appeal their sentences. Rather, convicted appellants are limited to one direct appeal as of right and discretionary review as granted by this court through a petition for review. After that, appellants have one year to bring additional postconviction challenges to a valid judgment through a personal restraint petition (PRP), unless subject to an exception. RCW 10.73.090, .100. These limitations help manage the flow of postconviction relief, protect the judiciary's time and resources, and foster respect for the finality of judicial decisions.

The lead opinion today relies on RCW 10.73.100(2) as an exception to the time bar to give the petitioners another shot at crafting a new constitutional rule and overturning precedent. Lead opinion at 5, 30. This exception reads, in part, "The time limit specified in RCW 10.73.090 does not apply to a petition or motion that is based solely on one or more of the following grounds: . . . [t]he statute that the defendant *was convicted of violating* was unconstitutional on its face or as applied to the defendant's conduct." RCW 10.73.100(2) (emphasis added).

This "constitutionality" exception is inapplicable according to the very plain language of the statute. This exception limits the challenge to the *statute* that the defendant "*was convicted of violating.*" *Id*. (emphasis added). This exception is inapplicable because the petitioners were not convicted of violating the mandatory

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

LWOP sentencing statute, RCW 10.95.030.  They were convicted of aggravated

murder—RCW 10.95.020.  The legislature clearly distinguishes between sentences

and convictions in the collateral attack statute.  *See* RCW 10.73.100(5), (6).  But the

lead opinion altogether bypasses the plain language of the statute and, instead,

erroneously relies on *In re Personal Restraint of Runyan* to justify its position—quoting

that "*convictions* under unconstitutional statutes . . . 'are as no *conviction* at all and

invalidate the prisoner's *sentence*.'"  Lead opinion at 5 (emphasis added) (quoting 121

Wn.2d 432, 445, 853 P.2d 424 (1993)).  This quote only further solidifies that this

exception applies to *convictions* and not *sentences*, and that it is wholly inapplicable to

the petitioners.

By forcing these PRPs through this exception, the court now permits virtually

all challenges to sentences while also, and most notably, avoiding the retroactivity

analysis required for changes in the law.  *See* RCW 10.73.100(5), (6); RAP 16.4(c)(4).

Retroactivity analysis is important because not every procedural technicality

merits overturning a valid sentence or conviction.  Yet, the lead opinion nonetheless

shoehorns the petitioners' claims through this exception, and in doing so, bypasses

this important barrier that safeguards the State's resources and the families of victims

from having to endure another trial or sentencing hearing.

Monschke and Bartholomew have been incarcerated for decades.  They had

their day in court to challenge their convictions and assert novel legal theories.  Their

*In re Pers. Restraint of Monschke and Bartholomew*, No. 96772-5
Owens, J., Dissenting

time expired, and they must now wait to see if other challengers are able to mount a successful legal challenge that is material to their cases. *See* RCW 10.73.100(6). Today, the lead opinion stretches the "constitutionality" exception beyond credulity to address the merits of Monschke's and Bartholomew's petitions. In doing so, it greatly expands the scope of personal restraint petitions in Washington. The people of Washington are entitled to their day in court. Monschke and Bartholomew had theirs. I am concerned that the rights of others will be diluted as courts must stretch thin resources even thinner to address this new class of collateral attacks.

III.     *The Court Must Apply Bassett To Determine What a "Cruel" Punishment Is Because Prohibiting Mandatory LWOP Is a Categorical Bar under* Ali

In deciding what punishments are prohibited under article I, section 14 of our state constitution, we must determine what "cruelty" is. To do this, the court has previously applied the *categorical bar*[3] test outlined in *Bassett*, 192 Wn.2d at 85-86. The *Bassett*[4] test provides a balanced approach for evaluating whether a punishment is cruel under the state constitution as applied to a certain class of persons by (1) analyzing whether this punishment is barred by other states through their legislatures and judiciaries and (2) exercising our independent judgment in

---

[3] Our other approach to cruelty, not applicable here, is the *Fain* proportionality test and it addresses sentences that are disproportionate to the crime. *Bassett*, 192 Wn.2d at 82 (citing *State v. Fain*, 94 Wn.2d 387, 617 P.2d 720 (1980)).

[4] The lead opinion expressly does not apply the categorical bar test of *Bassett* because it claims the petitioners did not argue for a categorical bar. Lead opinion at 29.

9

determining the culpability of the group when considering the crime and if the punishment serves legitimate penological goals. *Id.* at 85-87.

We are bound to apply *Bassett* based on our recent decision in *In re Personal Restraint of Ali*, where we held that *Miller*, 567 U.S. 460, was a *categorical bar on punishment* when *Miller* prohibited imposing mandatory LWOP sentences on juveniles. *In re Pers. Restraint of Ali*, 196 Wn.2d at 231-32, 238-39 n.5. There, we based our reasoning on *Montgomery v. Louisiana*, 577 U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016). In assessing *Miller*'s retroactivity, *Montgomery* held that *Miller*'s rule was retroactive because *Miller* categorically barred mandatory LWOP by "render[ing] life without parole an unconstitutional penalty for 'a class of defendants because of their status'—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." *Montgomery*, 136 S. Ct. at 734 (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002)).

As *Montgomery* clarifies, *Miller* was a case involving a categorical bar. This case is directly analogous to *Miller* and should also be analyzed under *Bassett*'s categorical bar approach. To make a very plain comparison, *Miller* barred imposing mandatory LWOP sentences on juveniles. Here, the lead opinion prohibits imposing mandatory LWOP sentences on defendants between the ages of 18 and 20. The *only difference* between this case and *Miller* is that we substitute "juveniles" with

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"defendants age 18 to 20." Accordingly, because *Miller* was a categorical bar case, this case is as well. Therefore, we must apply *Bassett* to determine whether mandatory LWOP is cruel punishment for this particular class.

But instead of simply applying *Bassett*, the lead opinion crafts a false distinction to sidestep *Bassett* by reasoning that it is not actually creating a *new class* but, rather, is only "enlarg[ing]" the class of "youthful defendants" who were protected in *Miller*. Lead opinion at 10, 30 n.17. This distinction is empty and of little help to the lead opinion because *Bassett* also merely "enlarged" *Miller*'s initial class.

*Miller* defined the initial class[5] of juveniles protected from LWOP as all "but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 136 S. Ct. at 734. In *Bassett*, we "enlarged" this class to include those defendants originally excluded from *Miller*—those whose crimes could have been said to have reflected "permanent incorrigibility." *Bassett,* 192 Wn.2d at 72, 88-89. *Bassett* was an extension of a class in the same sense that petitioners here are "extending" the class. Thus, even if petitioners are merely extending the class as the

---

[5] *Miller* further never exempted a vague class of "youthful defendants" as the lead opinion claims. Lead Opinion at 10. *Miller*'s holding expressly applied to "juveniles" under age 18: "[w]e therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" *Miller*, 567 U.S. at 465; U.S. Const. amend. VIII.

*In re Pers. Restraint of Monschke and Bartholomew*, No. 96772-5
Owens, J., Dissenting

lead opinion claims, they do not get to create a new and less rigorous test. They must

apply our precedent of "extending" a class, which is *Bassett*.

And while we could easily get lost in the semantical forest of distinguishing

"enlarging" a class from defining a proximate yet distinctive class, common sense

provides a sufficiently clear solution that should dictate the result. If we were to

decide *Miller* again today under our state constitution, those juveniles would be

subject to the categorical bar test, pursuant to *Bassett* and *Ali*. And had Monschke and

Bartholomew brought their claims alongside those juveniles, they would be subject to

the same exacting standard. I see no reason to require any less of the petitioners here

today.

IV.    *Applying Bassett, We Should Find That No States Have Expressly Exempted
       This Age Group (18-20) from Mandatory LWOP and That Young Adults Are
       More Responsible for Their Actions*

If the lead opinion applied *Bassett*, it would conclude that there are no states

that have expressly exempted 18-20 year olds from mandatory LWOP through the

legislative or judicial process. The lead opinion concedes there is "no national

majority" of states with such a rule and, furthermore, fails to show there are *any such*

*states* with such a rule. Lead opinion at 10 n.8. But nonetheless, the lead opinion

would apparently rewrite the national trend inquiry to include evaluation of factors

such as legislation that "carve[s] out rehabilitative space for 'young' or 'youthful'

offenders as old as their mid-twenties." *Id*. But this approach vastly departs from our

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

holding in *Bassett,* which expressly directs us to look at the national trends as applied

to the "*sentencing practice at issue.*" *Bassett*, 192 Wn.2d at 83 (emphasis added)

(citing *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 176 L. Ed. 2d 825

(2010)). While the lead opinion provides support for treating young adults with the

leniency of the juvenile system in limited circumstances, none of their authorities

address the *sentencing practice at issue*, i.e., mandatory LWOP for aggravated

murder.

But even assuming we could broaden our inquiry, there is still insufficient

evidence to find that the sentence is *unconstitutional beyond a reasonable doubt*.

*Bassett*, 192 Wn.2d at 77 (citing *State v. Hunley*, 175 Wn.2d 901, 908, 287 P.3d 584

(2012)). The lead opinion relies on laws in Washington D.C., Florida, and South

Carolina, among others, as states that create classes of "young adults" who may be

treated with leniency under the juvenile system. Lead opinion at 9-10 n.8.

But even these laws do not provide the support that the lead opinion claims for

an "affirmative trend" that is relevant to the petitioners, as many of these statutes

*expressly exempt* those young adults who commit murder or other violent crimes from

being treated with more leniency. *Id.* at 10 n.8. For example, Washington D.C.

carves out a "rehabilitative space" as the lead opinion asserts, but this "rehabilitative

space" applies only to "person[s] [who have] committed a crime other than murder."

D.C. CODE 24-901(6). Florida, likewise, permits lenient treatment as "youthful

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

offender[s]" only for those who did not commit a capital or life felony. FLA. STAT. ANN. § 958.04(1)(c). And South Carolina treats as "youthful offenders" only those who have not been convicted for a "violent crime." S.C. CODE ANN. § 24-19-10(d)(ii).

The lead opinion further erroneously relies on support from our state's laws when it notes that our juvenile court system can retain jurisdiction over juveniles in limited circumstances until the age of 25. Lead opinion at 21 (citing RCW 13.04.030(1)(e)(v)(C)(II)). Notably, however, our juvenile courts have no jurisdiction over 16-and 17-year-old juveniles who are charged with murder. RCW 13.04.030(1)(e)(v)(A), (C)(I); *see also* RCW 13.40.300(5) (subject to only a few exceptions, "the juvenile court has no jurisdiction over any offenses alleged to have been committed by a person eighteen years of age or older").

Thus, not only is there almost no evidence that there is a national trend of carving out a "rehabilitative space" for young adult murderers, but our own legislature has expressly spoken on this issue: young murderers are to be treated the same as adults under our laws.

But the lead opinion unnecessarily analyzes these statutes in the first place because the petitioners—required to prove the unconstitutionality of their sentences *beyond a reasonable doubt*—have put forth no such evidence of *any* legislative or judicial trend. *Bassett* 192 Wn.2d at 77 (citing *Hunley*, 175 Wn.2d at 908); *see* lead

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

opinion at 29 ("[T]he petitioners have neither argued nor shown that LWOP would be *categorically* unconstitutional as applied to older defendants."). The lead opinion far exceeds the confines of judicial restraint when it finds these authorities on its own accord and argues them on behalf of the petitioners. The petitioners have plainly put forth no evidence of a legislative trend, and this factor should weigh heavily against the petitioners.

Next, applying our independent judgment under the second prong of *Bassett*, the petitioners are fundamentally different from juveniles—they can get jobs, quit school, get married, form contracts, and drive cars—all without the permission of their parents. No longer juveniles with subordinate rights, these adults have the legal ability to "'extricate'" themselves from "'criminogenic setting[s].'" *Roper*, 543 U.S. at 569 (quoting Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 AM. PSYCHOLOGIST 1009, 1014 (2003)). Aggravated murder is undoubtedly one of the most serious crimes on the books, and permanently isolating murderers like Monschke and Bartholomew serves the legitimate penological goals of retribution, deterrence, and incapacitation. As the *Bassett* test does not weigh in this new class's favor, I would hold that mandatory LWOP is not unconstitutionally cruel.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

The lead opinion's ruling contains three critical flaws when it requires courts to exercise discretion in imposing LWOP sentences for 18-20 year olds. First, the lead opinion improperly strips the legislature's role in defining the age of majority and replaces it with a handful of scientific studies. The court's second guessing of the legislature is questionable as this court is inferior to the legislature in both time and resources to adequately consider the issue. Second, the lead opinion improperly applies the "constitutionality exception" under RCW 10.73.100(2) and circumvents the necessary retroactivity analysis. This will potentially flood courts with petitions, deprive courts of resources, and weaken protections against overturning finalized convictions and sentences on technicalities. Third, the lead opinion ignores our Washington "cruel" punishment jurisprudence by ignoring *Bassett*. By doing this, the lead opinion circumvents the reality that no states have extended such a protection, and jeopardizes our balanced approach to assessing "cruelty." The lead opinion's monumental rule today entails severe consequences that may lead to extending prohibitions of mandatory LWOP and SRA sentences to this new group under *Houston-Sconiers* and *Bassett*. This deserves a much more cautious approach, and I respectfully dissent.

16

*In re Pers. Restraint of Monschke and Bartholomew*, No. 96772-5
Owens, J., Dissenting

_____
Owens, J.

_____
Johnson, J.

_____
Madsen, J.

_____
Stephens, J.

17