# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55567-1-II |
| Respondent, | |
| v. | |
| SYDNEE NICOLE OLSON, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—Sydnee Nicole Olson drove a friend's car approximately 120 miles per hour before colliding with Douglas Sapp's car. Olson's boyfriend Joseph D. Careaga was a passenger in Olson's vehicle. Sapp was seriously injured and Careaga was killed.

The State charged Olson with vehicular homicide of Careaga and vehicular assault of Sapp. A jury found Olson guilty of both charges and found that Sapp had excessive injuries from the vehicular assault. The trial court imposed a standard range sentence for the vehicular homicide and a concurrent exceptional upward sentence for the vehicular assault.

On appeal, Olson claims that the charging document was constitutionally deficient. She argues the trial court erred by excluding testimony about medications she was prescribed after the collision and by refusing to give the jury an instruction on an alternative means. She contends that she received ineffective assistance of counsel because her attorney withdrew a proposed jury instruction on superseding intervening causes and undermined his own argument for an exceptional downward sentence. Finally, Olson argues that the trial court abused its discretion by

refusing to impose an exceptional downward sentence due to her youth. She seeks reversal of her convictions or resentencing by a different judge. We affirm Olson's convictions and sentence.

FACTS

I. BACKGROUND

One night in June 2018, a friend let Olson and Careaga take his 2007 Audi A4 for a drive to celebrate their 10-month anniversary. Olson was 18 years old. Initially, Careaga drove, and at Olson's request, he then let her drive.

Olson was driving on a straight portion of Hansville Road in Kitsap County. The intersection of Hansville Road and Little Boston Road had a flashing yellow light to alert traffic on Hansville Road that there was an intersection. The speed limit on this stretch of Hansville Road was 45 miles per hour.

Sapp was driving on Hansville Road in the opposite direction as Olson and Careaga. Sapp was in the middle of turning left onto Little Boston Road when the Audi struck his car. At the time of impact, Sapp's car was traveling 9 or 10 miles per hour. The Audi braked before the collision, leaving a skid mark that was 170 feet long. The Audi was traveling roughly 104 miles per hour at impact.

Sapp's car was pushed 150 feet backward and landed on its roof with Sapp partially ejected through the windshield. He was airlifted to Harborview Medical Center. He underwent multiple surgeries and has permanent health problems as a result of the collision. He also lost his job and experienced homelessness after the accident.

The Audi also landed upside down in a ditch on the other side of Hansville Road and caught fire. Witnesses pulled Olson from the driver's side of the vehicle. She had several broken bones.

Careaga died almost instantly from injuries to his heart. The car burned with Careaga's body inside.

## II. PRETRIAL

The State charged Olson with vehicular homicide of Careaga and vehicular assault of Sapp. The State later amended the charges to add an aggravating factor that Sapp's injuries substantially exceeded those necessary to constitute vehicular assault. The charge for vehicular homicide in both documents read, "On or about June 19, 2018 . . . [Olson] did drive or operate a motor vehicle in a reckless manner, *and did thereby proximately cause the death of* another person within three (3) years of such motor vehicle operation." Clerk's Papers (CP) at 1, 16 (emphasis added). Neither the original nor the amended information included language that Olson's reckless driving *proximately caused an injury* that proximately caused a person's death. But attached to both documents was a statement of probable cause that included the sentence: "Joseph Careaga died on scene as a result of injuries sustained from the collision." CP at 4, 19.

During motions in limine, the State moved to exclude any evidence or jury instruction that "Sapp's driving was a superseding, intervening cause of the collision." Suppl. Clerk's Papers (SCP) at 365, 368. The superseding intervening cause instruction was never formally submitted to the trial court, but the pattern instruction provides, in part,

> If you are satisfied beyond a reasonable doubt that the [[act] [or] [omission]] [driving] of the defendant was a proximate cause of [the death] [substantial bodily harm to another], *it is not a defense that the [conduct] [driving] of [the deceased] [or] [another] may also have been a proximate cause of the [death] [substantial bodily harm].*
>
> [However, if a proximate cause of [the death] [substantial bodily harm] was a new independent intervening act of [the deceased] [the injured person] [or] [another] which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen, the defendant's act is superseded

by the intervening cause and is not a proximate cause of the [death] [substantial bodily harm]. An intervening cause is an action that actively operates to produce harm to another after the defendant's [act] [or] [omission] has been committed [or begun].]

[However, if in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original act and the defendant's act is a proximate cause. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the [death] [substantial bodily harm] fall within the general field of danger which the defendant should have reasonably anticipated.]

11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 90.08 (5th ed. 2021) (WPIC) (emphasis added).[1]

The State argued that superseding intervening cause evidence and corresponding jury instruction should be precluded when a defendant's "conduct is the direct and unbroken cause of the harm suffered by the victims." SCP at 370. The State argued that even if Sapp had failed to yield properly before beginning his left turn, that would not have been a superseding intervening cause because the criminal nature of Olson's behavior did not change as a result of Sapp's action and Olson's conduct was still a proximate cause of Sapp and Careaga's injuries. Olson countered that "the jury could very easily find that [Sapp] . . . pulling directly in front of Ms. Olson without [signaling]" was a superseding cause because "[i]f he hadn't pulled in front of her, in a sense, we wouldn't be here." Verbatim Report of Proceedings (VRP) (Feb. 13, 2020) at 98.

The trial court explained that if "it was reasonably foreseeable that somebody could cross" a speeding defendant's path, that would be a concurrent, as opposed to intervening, cause. *Id.* at 103. The trial court ruled that it would wait to hear the evidence presented at trial before ruling on

---

[1] Because the language for the pattern jury instructions have not changed, we cite to the current edition throughout.

any jury instruction regarding Sapp's driving as a superseding intervening cause. Neither the parties nor the trial court discussed a mechanical failure as a possible cause of the collision at this stage.

### III. TRIAL

At trial, the State presented testimony from several people who saw the collision or stopped to help, six firefighters, nine law enforcement officers, airlifting flight nurse, three doctors who treated Sapp at Harborview, Sapp himself, and the forensic pathologist who performed Careaga's autopsy. A central piece of evidence admitted and referenced throughout the trial was a security camera video that showed Sapp's vehicle approaching the intersection and beginning to turn before being struck by the Audi, which was traveling at a high rate of speed and appeared to have brake lights activated.

Several of the police officers testified as experts in collision reconstruction, including Deputy Andrew Aman. The officers testified that before the impact, the Audi left a skid mark from braking that was approximately 170 feet long. Skid marks are caused by friction from the tires heating up oils on the road. The skid marks at the scene darkened as they approached the point of impact, which indicated that they were from braking, whereas marks from acceleration would have started off darker and grown lighter as they progressed. Aman explained calculations that showed that the Audi was traveling at approximately 120 miles per hour before Olson began braking at the start of the skid marks. The Audi's brake system was too damaged from the fire to analyze it for mechanical issues.

Aman testified that Sapp was not cited for a failure to yield. He also explained that if Olson had been driving 55 miles per hour before she began braking, there would have been no collision

because Sapp would have had "more than enough time" to complete his turn safely. VRP (Nov. 16, 2020) at 1182.

Olson testified at trial. She was "very confident" that she had been driving 50 miles per hour or less before the collision, in part because she delivered packages for work and therefore spent a lot of time driving. VRP (Nov. 18, 2020) at 1251. She remembered the speedometer reading 47 miles per hour. She testified that when she saw Sapp turn in front of her she stepped on the brakes, at which point the Audi "took off," and accelerated instead of braking. *Id.* at 1253.

When asked what medications she was prescribed for her injuries, Olson listed several painkillers. Defense counsel then asked if Olson was prescribed any other medication, and the State objected to Olson's answer:

> [OLSON]: They put me on a lot of medications. I later did go to a therapist, and I was put on antidepressants, [post-traumatic stress disorder] medications, and anti-anxiety.
>
> [PROSECUTOR]: Objection; relevance.
>
> [DEFENSE COUNSEL]: As to credibility. The jury is assessing her affect.
>
> [PROSECUTOR]: Objection. Your Honor, I'd like to be heard outside the presence of the jury.
>
> THE COURT: I'm going to sustain the objection. I don't need to hear it outside the presence of the jury. I'm going to ask the jury to disregard the answer. Please move on.

*Id.* at 1260.

Olson called the owner of the car to testify about modifications that had been made to the Audi, including adjustments to the suspension and the engine. Because several friends had performed the work, the owner could not provide specific details on the modifications besides stating that the car "was definitely a lot faster." VRP (Nov. 19, 2020) at 1308. The owner stated

that the Audi's speedometer was accurate. The people who had worked on the Audi were not called to testify.

In rebuttal, the State read into evidence a social media post Olson made a few weeks after the collision. In the social media post, Olson stated that Sapp had turned in front of her "after sitting there for a while with no turn signals." *Id.* at 1336. "When [he] turned I put two feet on the brake and turned left. But when I turned my body shifted, and my right foot slipped onto the gas, so it made it look like I was going faster than I was." *Id.* at 1336-37.

## IV. JURY INSTRUCTIONS

Vehicular homicide occurs when "the death of any person ensues within three years as a proximate result of injury proximately caused by" a defendant who drives a vehicle while "under the influence" of drugs or alcohol, "[i]n a reckless manner," or "[w]ith disregard for the safety of others." RCW 46.61.520(1). Vehicular assault occurs when a defendant "causes substantial bodily harm to another" by driving a vehicle while "under the influence" of drugs or alcohol, "[i]n a reckless manner," or "[w]ith disregard for the safety of others." RCW 46.61.522(1)(a)-(c).

Jury instructions were addressed after the State rested and again at the close of Olson's case. After the State rested, the trial court asked defense counsel if they needed to hold a hearing on the superseding intervening cause instruction. Defense counsel withdrew this proposed instruction. As a result, the trial court also did not include a sentence from the definitional instructions on "vehicular homicide" and "vehicular assault" that would have explained to the jury that it could find more than one proximate cause of a death or substantial bodily harm.

The State charged Olson under the "reckless manner" definitions of both offenses. Olson's proposed jury instructions included to convict instructions for vehicular homicide and vehicular

7

assault that used the definition about driving with disregard for the safety of others, not the definition involving recklessness.

Because vehicular homicide and assault are both most serious offenses under the driving in a reckless manner prongs, but not under the disregard for the safety of others prongs, Olson argued the disregard for safety of others prongs constituted lesser included offenses. *See* RCW 9.94A.030(32)(p), (q).[2] She contended the different levels of seriousness and lower sentencing range entitled her to a lesser included offense instruction for each crime based on disregard for the safety of others.

The State argued that the disregard for the safety of others prongs were alternative means of committing both offenses that were uncharged and that Olson was not entitled to an instruction addressing them. The trial court delayed its ruling to give defense counsel time to conduct additional research, but stated, "If there's not some indication that there's a lesser included . . . that the jury can hear about on either of these offenses, then the [proposed] instructions would be wholly inappropriate." VRP (Feb. 10, 2020) at 62.

Several days later, defense counsel reported that he was not able to find any additional case law to support his proposed instructions. The trial court rejected the proposed instructions, stating, "If it's not a lesser included, I can't give that instruction." VRP (Feb. 13, 2020) at 102.

When the parties reviewed the jury instructions after the State rested and again after the close of evidence, defense counsel did not object to the proposed to convict instructions for vehicular homicide and vehicular assault. When discussing removing language about disregard for the safety of others from the pattern to convict jury instructions, defense counsel said,

---

[2] We cite to the current statutory subsections because the relevant language has not changed.

"Unfortunately I think that's appropriate," and did not object to the deletion. VRP (Nov. 16, 2020) at 1195.

### V. CLOSING ARGUMENTS AND VERDICT

In closing, defense counsel argued that Olson had either accidentally stepped on the gas pedal, or that an unspecified problem with the Audi's brake system had caused the car to accelerate instead of brake. Counsel argued that Olson was tired that night and it was possible she stepped on the gas thinking it was the brake. VRP (Nov. 19, 2020) at 1393 ("She goes to hit the brake, and the car accelerates. Did she step on the gas? Who knows?"). Counsel continued, "Was there a mechanical failure in a heavily modified . . . 11-year-old car driven by a teenage boy. Man, what a recipe for a mechanical failure. The police would never look at that." *Id.* Defense counsel emphasized that the State had not presented any evidence of the Audi's rate of acceleration. And counsel argued Sapp had caused the accident by turning in front of Olson without paying attention to his surroundings.

In rebuttal, the State insisted that there was "no evidence" to support the theory that Olson was accelerating rather than braking just before the collision. *Id.* at 1428. The State focused on the skid marks and the video of the collision to demonstrate that the Audi was braking rather than accelerating prior to impact.

The jury convicted Olson of vehicular homicide of Careaga and vehicular assault of Sapp and issued a special verdict finding that Sapp's injuries substantially exceeded the level of harm necessary to constitute vehicular assault.

VI. SENTENCING

Olson had a prior conviction and deferred sentence for hit and run, and her 2 current convictions each had multipliers of 2, so her offender score for both convictions was 3 points. The standard range sentence for vehicular homicide was therefore 102 to 136 months and the standard sentence range for vehicular assault was 13 to 17 months.

The State asked the trial court to impose a sentence near the top of the standard range for the vehicular homicide and an exceptional upward sentence for the vehicular assault based on the facts of the case and because Olson was on a deferred prosecution for another driving offense at the time of the accident. The State asked the trial court to impose 128 months of confinement for the vehicular homicide and 20 months concurrently for the vehicular assault.

Defense counsel requested an exceptional downward sentence of 80 months for the vehicular homicide based on Olson's lack of maturity and prospects for rehabilitation. Defense counsel argued that because Olson was 18 years old at the time of her offense, the trial court was required to consider the mitigating qualities of her youth. And counsel's sentencing memorandum invited the trial court to consider the factors listed in *Kent v. United States*[3] that juvenile courts use to determine when they should waive jurisdiction over a juvenile defendant.

At sentencing, defense counsel sought to explain Olson's repeated assertion that she had been traveling only slightly over the speed limit, hypothesizing that an "inexperienced driver, a teenager, mistook looking at the tachometer and seeing that as being five to ten miles an hour over." VRP (Jan. 11, 2021) at 108. "So instead of the speedometer that says she's going . . . 45 to 55 miles an hour, you have a tachometer that's indicating 4500 RPM to 5500 RPM or somewhere

---

[3] 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).

in there, which would be more consistent with this car in its highest gear going, you know, 5,000 RPMs." *Id.* at 108.

When defense counsel turned to address Olson's youthfulness, he said, "I'll be honest, Your Honor. I think the idea of an exceptional downward is a tough sell, given the current state of the law," before reminding the trial court that human brains do not finish developing until the mid-20s. *Id.* at 116. "That lack of wiring manifests in impulsivity, and . . . rash and heedless disregard for other people which is exactly the elements that we're looking at in vehicular homicide and vehicular assault." *Id.* Defense counsel also emphasized that leniency would allow Olson to work and pay restitution sooner.

The trial court emphasized that there was no evidence that Olson had been "under the influence of alcohol or anything that would have in any way accounted for the way she was driving except for intentional action." *Id.* at 128. And the trial court considered several *Kent* factors including the gravity of the offense and Olson's prior criminal history, and the fact that she had not completed the deferred sentence for her hit and run conviction:

> We have scientific evidence that establishes that she was going 120 miles an hour for a football field and a half before the impact. So the manner in which this was committed was . . . definitely willful.
>
> Sophistication and maturity of the youth, you know, you can come in here and say that she was an inexperienced driver. Ms. Olson herself . . . said, "I drive for a living." She was a package deliverer. She was a driver. She had been driving for years. She told the jury that she was an experienced driver. This is what she did for a living.
>
> And her offense history -- the offense history is what's the most troubling of all here because she was on a deferred and only halfway through when this happened. That deferred should have been her wake-up call.
>
> . . . .

11

> That's going through the court system. That's knowing the seriousness of what's going on. Now I have two years I can't drive like that. Now I have two years I can't violate the law. If I do, I get screwed up. This is going on my record, and I'm going to get in a lot of trouble. That wasn't enough to turn around and have her stop and think.
>
> I don't know what her prospects are for rehabilitation one way or the other, but I don't find that the youthfulness factor, which I've considered, sways the Court to impose a sentence below the guidelines.

*Id.* at 128-29. And the trial court referred to the specific nature of drivers' licenses and youth in

the context of Olson's occupation:

> We aren't talking about a burglary or an Assault 2. We're talking about a driving-related offense. And I can't ignore the fact that, when people get to be 16, they are treated as an adult when it comes to driving offenses.
>
> They don't get their license without education. They don't get their license without training. So these people are supposed to know what they're doing. This is not impetuosity when we're talking about driving. This is operating a 4,000-pound vehicle and having been trained to do so. This is something she did for a living, was driving.
>
> So to say that just because she was young, she was actually two years over the age she could have gotten a license. And again, this was her career . . . at that time.
>
> . . . .
>
> She was going over a hundred miles an hour. She killed a man, plain and simple.
>
> And for that reason, and understanding that she had a prior reckless, a prior hit-and-run with the law, was on a deferred, I don't find youthful sanctions appropriate.

*Id.* at 130-31.

The trial court also declined the State's request to impose a sentence at the high end of the

standard range for vehicular homicide. Instead, the trial court imposed a sentence of 115 months,

below the middle of the standard range, for the vehicular homicide and a concurrent exceptional

upward sentence of 20 months for the vehicular assault based on the jury's finding of excessive injury to Sapp.

Olson appeals. She argues that this court should reverse her convictions or remand for resentencing before a different judge.

## ANALYSIS

### I. CHARGING DOCUMENTS

Olson argues that both the original and amended information omitted an essential element of vehicular homicide. She argues that the lack of language alleging that she "*proximately cause[d] an injury* that proximately cause[d] the death of a person," violated her constitutional right to be informed of the charge against her. Br. of Appellant at 2 (some emphasis omitted). We disagree.

A defendant has a right under the state and federal constitutions to be informed of the criminal charges against them so that they will be able to mount a defense at trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Canela*, 199 Wn.2d 321, 328, 505 P.3d 1166 (2022). To be constitutionally sufficient, a charging document must contain all of the essential elements of an offense. *Canela*, 199 Wn.2d at 328. "Essential elements are those elements of a crime 'necessary to establish the very illegality of the behavior charged.'" *Id*. (internal quotation marks omitted) (quoting *State v. Zillyette*, 178 Wn.2d 153, 158, 307 P.3d 712 (2013)). Thus, a defective information is an issue of constitutional magnitude reviewable for the first time on appeal. *State v. Davis*, 60 Wn. App. 813, 816, 808 P.2d 167 (1991).

The defendant must be "informed of the charged crime so that [they] can effectively defend against the charges." *Canela*, 199 Wn.2d at 334. But, it is "not fatal to an information or complaint that the exact words of . . . [the] element are not used," so long as "all the words used

would reasonably apprise an accused of the elements of the crime charged." *State v. Kjorsvik*, 117 Wn.2d 93, 109, 812 P.2d 86 (1991). "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." *Id.*

The Supreme Court "has established a presumption in favor of the validity of charging documents when the challenge is made after conclusion of the trial." *Canela*, 199 Wn.2d at 329. "Charging documents [that] are not challenged until after the verdict will be more liberally construed in favor of validity than those challenged before or during trial." *Kjorsvik*, 117 Wn.2d at 102. When a charging document is challenged for the first time on appeal, this court considers two questions: "(1) do the necessary facts appear in any form, or by fair construction can they be found, in the charging document; and, if so, (2) can the defendant show that [they were] nonetheless actually prejudiced by the inartful language which caused a lack of notice?" *Id.* at 105-06. In answering the first question, we examine only the face of the charging document to determine if it contains the essential elements. *Id.* at 106. If the essential elements are present or fairly implied, then we may consider if "other circumstances of the charging process can reasonably inform the defendant in a timely manner of the nature of the charges" when analyzing prejudice. *Id.* "If the necessary elements are not found or fairly implied . . . we presume prejudice and reverse without reaching the question of prejudice." *State v. McCarty*, 140 Wn.2d 420, 425, 998 P.2d 296 (2000).

In *Kjorsvik*, the defendant held a knife to a baker's throat and took money from the cash register. 117 Wn.2d at 111. The information omitted "intent to steal" from the charge for robbery, but included an allegation that the defendant "'did unlawfully take personal property . . . from the person and in the presence of [the victim], against his will, by the use or threatened use of

immediate force, violence and fear of injury to such person or his property.'" *Id*. at 96. The Washington Supreme Court held that the essential elements of robbery could be construed from reading the information "in a commonsense manner." *Id.* at 111. The Supreme Court also held that Kjorsvik was not prejudiced by the missing language because the certificate of probable cause sufficiently informed him of the crime charged and the to convict jury instruction contained the correct elements of robbery. *Id*.

Vehicular homicide requires "the death of any person . . . within three years as a proximate result of injury proximately caused by the driving of any vehicle by [the defendant]." RCW 46.61.520(1). Division Three has recognized that a causal connection between the fatal accident and the driver's impairment, recklessness, or disregard is an essential element of vehicular homicide that must be included in the charging document. *State v. Sanchez*, 62 Wn. App. 329, 331, 814 P.2d 675 (1991). Division One has similarly held that an information charging vehicular homicide was sufficient when it properly linked the defendant's alcohol consumption and the victim's injury and death. *State v. Thang Dong Tang*, 75 Wn. App. 473, 475-76, 878 P.2d 487 (1994). Olson points to no case holding that the intermediate step that the reckless driving must be the proximate cause *of an injury* that then must be the proximate cause of the death is an essential element.

The amended information charged that Olson "did drive or operate a motor vehicle in a reckless manner, and did thereby proximately cause the death of another person within three (3) years of such motor vehicle operation." CP at 16. Olson did not challenge the sufficiency of the charging documents below, so we must presume the information was sufficient and read the amended information in a commonsense manner and liberally construe its language. *Canela*, 199

Wn.2d at 329; *Kjorsvik*, 117 Wn.2d at 102. Olson acknowledges that the jury instructions properly described the proximate cause elements of vehicular homicide and thus relies solely on the first prong of the *Kjorsvik* test. She invites us to consider a scenario where "a defendant is led to believe that reckless driving producing no injury can still result in conviction for vehicular homicide if someone dies," such as if a bystander suffers a fatal heart attack. Br. of Appellant at 25.

The information does fail to expressly allege that Olson's driving *caused an injury* that caused Careaga's death. But Olson's hypothetical did not occur in this case. Olson was not charged with the death of an uninjured bystander or someone who was mildly injured and then died later under muddled circumstances. Here, the amended information charged that Olson drove in a reckless manner and thereby proximately caused Careaga's death. Careaga died within seconds of the collision. It is difficult to imagine how Olson could have caused the death of her passenger without also causing an injury. The facts before us are clearly distinguishable from Olson's hypothetical of an uninjured bystander dying from a heart attack. Liberally construing the information and reading it "in a commonsense manner," the information alleges that Olson's driving in a reckless manner proximately caused injuries to Careaga that proximately caused his death. *Kjorsvik* 117 Wn.2d at 111. Olson was reasonably apprised of the elements of the crime charged. Thus, we can fairly construe all of the essential elements of vehicular homicide from the charging document.

For the prejudice prong, we may look beyond the face of the charging document. *Id.* at 106. Here, the certificate of probable cause stated that "Careaga died on scene as a result of injuries sustained from the collision," and the to convict jury instruction included the intermediate step of Olson's driving proximately causing an injury that proximately caused a death within three years.

16

CP at 19, 288. Thus, Olson cannot demonstrate prejudice. We conclude that the amended information was sufficient.

## II. TESTIMONY ABOUT OLSON'S MEDICATION

Olson argues the trial court abused its discretion by sustaining the State's relevance objection to testimony about medication that Olson was prescribed after the collision. Olson claims that her "ongoing use of prescribed drugs explained her affect" while testifying and was relevant to her credibility. Br. of Appellant at 56. Olson asserts that exclusion of the testimony materially affected the outcome of her trial because her "defense turned on jurors believing her version of events and therefore turned on their assessment of her credibility on the stand." *Id.* We disagree.

A defendant has a constitutional right to present testimony and evidence in their defense. U.S. CONST. amend. VI; WASH. CONST., art. I, § 22; *State v. Weaville*, 162 Wn. App. 801, 818, 256 P.3d 426 (2011). This right is violated if a defendant is deprived of the ability to present their defense, such as if the trial court improperly excludes all evidence of a defense. *See, e.g.*, *State v. Ward*, 8 Wn. App. 2d 365, 371-72, 438 P.3d 588 (2019).

ER 402 provides for the admission of relevant evidence. "'To be relevant . . . evidence must (1) tend to prove or disprove the existence of a fact, and (2) that fact must be of consequence to the outcome of the case.'" *Weaville*, 162 Wn. App. at 818 (alteration in original) (quoting *Davidson v. Mun. of Metro. Seattle*, 43 Wn. App. 569, 573, 719 P.2d 569 (1986)). Relevant facts include those "which offer direct or circumstantial evidence of any element of a claim or defense." *Davidson*, 43 Wn. App. at 573. "[A] defendant has no right to present irrelevant evidence." *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). We will reverse a conviction for improper exclusion of evidence only if the error resulted in prejudice, which occurs if there is

a reasonable probability that the error materially affected the outcome of the trial. *State v. Howard*, 127 Wn. App. 862, 871, 113 P.3d 511 (2005). "In assessing whether the error was harmless, we must measure the admissible evidence of [the defendant's] guilt against the prejudice, if any, caused by the erroneous exclusion." *Id*.

Even assuming the testimony about medications that Olson was prescribed after the collision was relevant to the charges for vehicular homicide and assault, any error was harmless in light of the objective evidence that supported her convictions. The skid marks at the scene, testimony of disinterested witnesses, and visible brake lights in video footage of the collision all show that Olson was braking before impact, not accidentally accelerating. And Olson's own social media post gave a different version of events than what she testified at trial. The testimony about Olson's medications was not exculpatory and was significantly outweighed by the evidence of Olson's guilt. *Id.* And the refusal to admit the testimony did not deprive Olson of her right to present her version of events. Thus, any error in declining to admit the testimony was harmless.

## III. JURY INSTRUCTIONS

### A.    Alternative Means Instruction

Olson argues that the trial court erred when it refused to give the jurors instructions allowing them to convict Olson under the definitions of "vehicular homicide" and "vehicular assault" requiring disregard for the safety of others, instead of recklessness as charged by the State. Convictions under the disregard for the safety of others prongs would have reduced her available sentencing range and not constituted strike offenses. Olson asserts that the refusal to issue the instructions presenting disregard for the safety of others as an alternative means violated her constitutional right to present a defense. We disagree and conclude that Olson waived this issue.

CrR 6.15(c) requires parties to make timely and reasoned objections so "'the trial court may have the opportunity to correct any error.'" *State v. Smith*, 174 Wn. App. 359, 365, 298 P.3d 785 (2013) (internal quotation marks omitted) (quoting *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988)). A party must state any objections to the jury instructions, as well as the grounds for the objections, in the record to preserve review. *State v. Sublett*, 176 Wn.2d 58, 75-76, 292 P.3d 715 (2012). Similarly, if a court fails to issue a proposed instruction, the party must object to that failure. *Goehle v. Fred Hutchinson Cancer Rsch. Ctr.*, 100 Wn. App. 609, 614, 1 P.3d 579 (2000). The failure to object to an instruction waives the claim of error on appeal unless the instruction presents a manifest error affecting a constitutional right. *Smith*, 174 Wn. App. at 365.

After Olson proposed the instruction, the trial court gave counsel time to locate support for it. Although Olson now describes her attorney's conduct as objecting, counsel ultimately agreed with the trial court that it was "appropriate" to provide the jury with instructions that described only the recklessness prongs of both charges. VRP (Nov. 16, 2020) at 1195. This was not a statement of "reasons for [an] objection, specifying the number, paragraph, and particular part of the instruction to be given or refused." CrR 6.15(c); s*ee Goehle*, 100 Wn. App. at 614. Thus, Olson waived any challenge to the instruction.

Moreover, when a statute provides "alternative means by which a crime can be committed, the charging document may charge none, one, or all of the alternatives, provided the alternatives charged are not repugnant to one another." *State v. Williamson*, 84 Wn. App. 37, 42, 924 P.2d 960 (1996). Division One in *State v. Downey* held that vehicular assault through disregard for the safety of others is an alternative means of vehicular assault through recklessness, not a lesser included offense. 9 Wn. App. 2d 852, 857-58, 447 P.3d 588 (2019). This holding also applies to the

definitions for "vehicular homicide." *See State v. Roggenkamp*, 115 Wn. App. 927, 935, 64 P.3d 92 (2003) (stating that case law construing alternative means of vehicular homicide is "equally applicable" to vehicular assault). We see no reason to depart from *Downey*. And Olson provides no authority to support her assertion that a trial court's refusal to instruct a jury on an uncharged alternative means violates a defendant's right to present a defense. To the contrary, where the defendant has argued error when the trial court instructed the jury on an uncharged alternative means, this court has recognized this amounts to reversible error unless the State can show the error was harmless. *See State v. Sanchez*, 14 Wn. App. 2d 261, 266, 471 P.3d 910 (2020). Thus, there was no manifest error warranting reversal despite defense counsel's waiver.

B.      Superseding Intervening Cause Instruction

Olson's trial counsel never argued that a possible mechanical failure in the Audi might justify a jury instruction on superseding intervening cause. Defense counsel's proposed superseding intervening cause instruction was based on the argument that if Sapp had not turned his car in front of Olson, there would have been no collision. Defense counsel withdrew the proposed instruction after the State rested and did not raise it again with regard to the alleged mechanical failure.

Olson argues that her attorney was ineffective for withdrawing the proposed instruction on superseding intervening causation. Although the instruction was initially proposed with regard to Sapp's driving, Olson now asserts that withdrawing the instruction was not a legitimate trial tactic in light of defense counsel's closing argument that a mechanical failure could have made the Audi accelerate when Olson tried to brake. Olson contends that the lack of a superseding intervening cause instruction prejudiced her because without the instruction, "the Audi's mechanical defect

was, at most, an additional proximate cause of the collision and therefore not a basis on which to acquit Olson." Br. of Appellant at 41. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To demonstrate that she received ineffective assistance of counsel, Olson must show that defense counsel's performance was deficient and that the deficient performance resulted in prejudice. *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). "Performance is deficient if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017) (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Prejudice ensues if there is a "reasonable probability" that the result of the trial would have been different had defense counsel not performed deficiently—a mere "'conceivable effect on the outcome'" is not sufficient to show prejudice. *Id*. (internal quotation marks omitted) (quoting *State v. Crawford*, 159 Wn.2d 86, 99, 147 P.3d 1288 (2006)). The failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

We strongly presume that counsel's performance was not deficient. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). To overcome this presumption, Olson "'must show in the record the absence of legitimate strategic or tactical reasons'" supporting counsel's conduct. *Id.* (quoting *McFarland*, 127 Wn.2d at 336). Where defense counsel's failure to request a particular jury instruction is the basis for a claim of ineffective assistance, the defendant must show they were "entitled to the instruction, counsel's performance was deficient in failing to request it, and the failure to request the instruction caused prejudice." *Classen*, 4 Wn. App. 2d at 540. Because

defense counsel did not argue Olson was entitled to a superseding intervening cause instruction based on mechanical failure and ultimately withdrew the proposed instruction, we apply this analysis in this case.

An act that produces an injury is generally the proximate cause of that injury, unless "a new, independent act breaks the chain of causation," thereby superseding the original act as the proximate cause of the injury. *Roemmich v. 3M Co.*, 21 Wn. App. 2d 939, 952, 509 P.3d 306 (2022), *petition for review filed*, No. 82132-6 (Wash. Aug. 2022). To be a superseding cause, an intervening act must not be reasonably foreseeable to the defendant. *Albertson v. Dep't of Soc. & Health Servs.*, 191 Wn. App. 284, 297, 361 P.3d 808 (2015). When determining if the evidence at trial supported giving an instruction, we must "view the supporting evidence in the light most favorable to the party that requested the instruction." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

The pattern instruction for superseding intervening cause of vehicular homicide or assault distinguishes proximate causes from superseding causes and explains that it is not a defense that the conduct of another may also have been a proximate cause of the death or substantial bodily harm. WPIC 90.08. In other words, a merely concurrent proximate cause is not a defense. There must have been "a new independent intervening act" of "which the defendant, in the exercise of ordinary care, should not reasonably have anticipated as likely to happen" to warrant a jury finding that there was a superseding cause of the accident. *Id.* An intervening cause is an action that actively operates to produce harm to another after the defendant's act has begun. *Id.*

The test for giving a jury the superseding intervening cause instruction is whether the alleged intervening act created a different type of harm, was "an extraordinary act," and "operated

independently" of the defendant's criminal conduct. *Roggenkamp*, 115 Wn. App. at 945. In weighing whether the instruction was merited, we must view the evidence in the light most favorable to Olson. *Fernandez-Medina*, 141 Wn.2d at 455-56.

The sole evidence of modifications to the Audi was the owner's testimony, which was limited because he had not worked on the car himself and could not provide concrete information about the changes to the vehicle. Olson also presented her own testimony to support the theory that the car accelerated before the collision. Viewing the evidence in the light most favorable to Olson, it may have been appropriate for the trial court to issue the superseding intervening cause instruction had it been requested. *Classen*, 4 Wn. App. 2d at 540.

But, there was a strategic reason for counsel to decline to seek the superseding intervening cause instruction with regard to mechanical failure. "A concurring cause does not shield a defendant from a vehicular homicide conviction." *State v. Roggenkamp*, 153 Wn.2d 614, 631, 106 P.3d 196 (2005); *see also Roggenkamp*, 115 Wn. App. at 935. The superseding intervening cause instruction informs the jury, "it is not a defense" merely that a concurrent proximate cause of the accident existed. WPIC 90.08. And issuing the instruction would have required definitional instructions to further inform the jury that there may be multiple proximate causes of death or injury. *See* WPIC 90.07. Instead, the statement, "There may be more than one proximate cause of death," was removed from the jury instructions. *Compare* CP at 34, 37, *with* CP at 286, 290.

Defense counsel would therefore have been forced to inform the jury of the distinction between concurrent and superseding causes. Further, focusing on the alleged mechanical failure to lay the foundation for a superseding intervening cause instruction may have caused the jury to question why Olson had not gone to greater lengths to establish that there was a problem with the

Audi. And this tactic would have been problematic in light of fact that the Audi's brake system was too damaged to analyze for evidence of mechanical failure.

Instead, defense counsel raised three contentions in closing—that Olson may have accidentally stepped on the gas pedal, that the State failed to investigate a possible mechanical issue that caused the Audi to accelerate when Olson tried to brake, and that Sapp's lack of attention had caused the accident. Defense counsel was able to argue for reasonable doubt without informing the jury of the high level of intervention required for a proximate cause of an injury to be a superseding intervening cause.

It was not outside the realm of legitimate trial tactics for defense counsel to plant doubt in the jurors' minds as to whether Olson had been reckless and whether she had been the proximate cause of the accident, while also avoiding instructions that would have informed the jury that finding a concurrent cause would not bar a conviction. *Emery*, 174 Wn.2d at 755. We hold that counsel's performance did not fall below an objective standard of reasonableness in light of all the surrounding circumstances.[4]

We hold that Olson's trial counsel was not ineffective for withdrawing the superseding intervening cause instruction.

---

[4] We note that Olson also cannot demonstrate prejudice. The trial court admitted testimony from several experts that the skid marks were from braking, not acceleration, and that there are differences between the two kinds of marks. The sole evidence of the Audi's acceleration capability was general testimony from the owner that the car "was definitely a lot faster" after his friends modified the engine. VRP (Nov. 19, 2020) at 1308. And Olson provided only her own testimony to rebut the State's objective evidence that she had been traveling at 120 miles an hour before braking just before the collision. Olson cannot demonstrate a reasonable probability that the outcome would have been different had defense counsel sought the instruction. *Estes*, 188 Wn.2d at 458.

IV. SENTENCING

A. Argument About Olson's Youth at Sentencing

Olson also argues that defense counsel was ineffective when he stated that "'the idea of an exceptional downward [sentence] is a tough sell, given the current state of the law.'" Br. of Appellant at 75. She contends that the statement prejudiced her ability to receive an exceptional downward sentence and requests this court remand for a new sentencing hearing. Br. of Appellant at 76. We disagree.

The Supreme Court has identified a "constitutionally significant" difference between the brains of "18- to 20-year olds . . . and persons with fully developed brains." *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 325, 482 P.3d 276 (2021). But the Supreme Court has also recognized that "[n]ot every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will." *Id*. at 326. Although a trial court must expressly consider "hallmark features of youth" when sentencing juveniles, there is not currently any similar requirement when sentencing young adults. *State v. Wright*, 19 Wn. App. 2d 37, 46, 493 P.3d 1220 (2021), *review denied*, 199 Wn.2d 1001 (2022). While youth may mitigate culpability, "age is not a per se mitigating factor" entitling all young adult defendants to exceptional downward sentences. *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015).

Because Olson was 18 at the time of her offense, the trial court had no absolute obligation to treat her youth as a mitigating factor. *Id.* Defense counsel seemed to acknowledge this before arguing that Olson's relative youth and impulsivity contributed to her offense. Counsel also asserted that the elements of vehicular homicide and assault align with a youthful brain's tendency toward rash behavior, and emphasized Olson's prospects for rehabilitation. And counsel

encouraged the trial court to consider leniency so that Olson would be able to pay restitution sooner.

Briefly acknowledging that the law around young adult sentencing was in flux and not completely in Olson's favor did not fall below an objectively reasonable standard of performance, especially in light of defense counsel's vigorous argument for leniency based on Olson's youth, earning potential, and prospects for rehabilitation. *Estes*, 188 Wn.2d at 458. In addition, as discussed below, the trial court extensively considered Olson's youth and rejected it as a basis for imposing an exceptional downward sentence. There is not a "reasonable probability" that Olson would have received a lighter sentence had defense counsel opened his sentencing argument differently. *Id*.

We hold that Olson did not receive ineffective assistance of counsel at sentencing.

B.      Consideration of Olson's Youth at Sentencing

Olson argues the trial court abused its discretion when it refused to impose an exceptional downward sentence. She claims the trial judge "made it clear he categorically refused to impose an exceptional sentence based on youth where the crimes at issue were driving-related." Br. of Appellant at 66. She requests this court remand for resentencing by a different judge. We disagree.

Every defendant is entitled to ask a sentencing court to impose an exceptional sentence below the standard range and have the court consider the request. *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). We review a denial of an exceptional sentence to determine if the trial court failed to exercise discretion or abused its discretion by ruling on an impermissible basis. *State v. McGill*, 112 Wn. App. 95, 99-100, 47 P.3d 173 (2002). "When a court has considered the facts and concluded there is no legal or factual basis for an exceptional sentence, it

26

has exercised its discretion, and the defendant cannot appeal that ruling." *Id*. at 100. As stated above, youth "is not a per se mitigating factor" for young adult defendants. *O'Dell*, 183 Wn.2d at 695. If youth relates to a defendant's crime, it can "amount to a substantial and compelling factor, in particular cases, justifying a sentence below the standard range." *Id.* at 696.

Defense counsel emphasized Olson's youth in both his memorandum and argument at sentencing. At defense counsel's suggestion, the trial court considered several factors from *Kent* that are used to determine when a juvenile court should waive jurisdiction over a juvenile defendant. *See* 383 U.S. at 566-67. The *Kent* factors include the seriousness of the offense, whether the "offense was committed in an aggressive, violent, premeditated or willful manner," whether the offense was against people or property, the defendant's sophistication and maturity, the defendant's prior criminal history, and the "prospects for adequate protection of the public and the likelihood of reasonable rehabilitation." *Id*. at 567.

In analyzing the seriousness of the offense and manner of commission, the trial court described evidence that Olson had been driving at 120 miles per hour as proof that her actions were "definitely willful." VRP (Jan. 11, 2021) at 128. And with regard to Olson's sophistication and maturity, the trial court noted, "She was a package deliverer. . . . She told the jury that she was an experienced driver. This is what she did for a living." *Id.* The trial court also emphasized that Olson had been previously arrested for a driving offense and had not completed her deferred sentence at the time of the collision. The trial court stated, "I don't know what her prospects are for rehabilitation one way or the other," but overall found that Olson's youth did not merit an exceptional downward sentence. *Id.* at 129.

In context, the trial court's comment about drivers receiving licenses at the age of 16 was a rejection of defense counsel's argument that Olson was an inexperienced driver who misread the tachometer despite her driving-centered job, not a categorical refusal to consider youth in driving-related offenses. The trial court extensively analyzed Olson's youth against the circumstances of her offense and found that her age did not justify an exceptional downward sentence. The trial court did not fail to exercise its discretion or rule on an impermissible basis—instead, it exercised its discretion to consider Olson's youth and found that there was no factual basis supporting an exceptional downward sentence. *McGill*, 112 Wn. App. at 99-100.

We hold that it was not an abuse of discretion for the trial court to decline to impose an exceptional downward sentence after considering Olson's youth. Because we affirm Olson's sentence, we need not consider her request to be resentenced by a different judge.

## CONCLUSION

We affirm Olson's convictions and sentence.

No. 55567-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, CJ

Glasgow, C

We concur:

Maxa, J.

Cruser, J.